Mr. Justice McLEAN.
Smith v. Turner.
Under the general denomination of health laws in New York, and by the seventh section of an act relating to the marine'hospital, it is provided, that “the heálth-cómmissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, -in his name of office, the following sums from' the master of every vessel that shall arrive in the port of New York, viz.: —
“1. From the master of every vessel from a foreign port, for himself and each cabin passenger, one dollar and fifty cents; for each steerage passenger, mate, sailor, or mariner, one dollar.
“ % From the master of each coasting-vessel, for each person *393 on board, twenty-five cents; but no coasting-vessel from the States of New Jersey, Connecticut, and Rhode Island shall pay for more than one voyage in each month, computing from the first voyage in each year.”
The eighth section provides that the money so received shall be denominated “hospital moneys.” And the ninth section gives “ each master paying hospital moneys a right to demand and recover from each person the sum paid on his account.” The tenth section declares any master, who shall fail to make the above payments within twenty-four hours after the arrival of his vessel in the port, shall forfeit the sum of one hundred dollars. By the eleventh section, the commissioners of health are-required to account annually to the Comptroller of the State for all moneys received by them for the use of the marine hospital; .“and if such moneys shall, in any one year, exceed the sum necessary to defray the expenses of their trust, including their own salaries, and exclusive of such expenses as are to be borne and paid as a part of the contingent charges of the city of New York, they shall pay over such surplus to the treasurer of the Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of jthe society.”
, The plaintiff in error was master of the British ship Henry Bliss, which vessel touched at the port of New York in the month of June, 1841, and landed two hundred and ninety steerage passengers. The defendant in error brought an action of debt on the statute against the plaintiff, to recover one dollar for each of the above passengers. A demurrer was filed, on the ground that the statute of New York was a regulation of commerce, and in conflict with the Constitution of .the United States. The Supreme Court of the State overruled the demurrer, and the Court of Errors affirmed the judgment. This brings before this court, under the twenty-fifth section of the Judiciary Act, the constitutionality of the New York statute.
I will consider the case under two general heads: —
1. Is the power of Congress to regulate commerce an exclusive power ?
2. Is the statute of New York a regulation of commerce ?
• In the eighth section of the first article of the Constitution it is declared that Congress shall have power “ to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.”
Before the adoption of the Constitution, the.States, respectively, exercised sovereign power, under no other limitations than those contained in the Articles of Confederation. By the third section of the sixth article of that instrument, it was declared that “ no State shall lay any imposts or duties which may *394 interfere with any stipulations in treaties entered into by the United States in Congress assembled”; and this was the only commercial restriction orf State power.
As might have been expected, this independent legislation*, being influenced by local interests and policy, became conflicting and hostile, insomuch that a change of the system was tie-, cessary to.preserve the fruits of the Revolution. ■ This led to the adoption of the Federal Constitution.
It isiadmitted that, in regard to the. commercial,, as to other powers, the States cannot be held .to have parted with any of the attributes of sovereignty which are not plainly vested in the Federal government and inhibited to the States, either expressly or by necessary implication. This, implication may arise from the nature of the power.
In the same, section which gives the commercial power to Congress,, is given power “ to borrow, money on the credit of the United States,” “ to establish a uniform rule of naturalization,” “to coin móney,” “ to establish post-offices and post-roads,” “ to constitute tribunals inferior to the Supreme Court,” “to define and punish piracies and felonies committed on the high seas,” “to declare war*” “to provide and maintain-a. navy,” &c., and “to make all laws which shall be necessary and proper for carrying into execution the foregoing powers-..”
Only one. of these powers is, in the Constitution, expressly inhibited to the States; and yet, from the nature of the other powers, they are equally beyond- State jurisdiction.
In the case of .Holmes v. Jennison, 14 Peters, 570, .the chief justice, in giving his own and the opinion of three of his breth-> ren, says: — “ All the powers which relate to our foreign inter?, course are confided to the general government. Congress have the power to regulate commerce, to define and punish piracies,” &c. “ Where an authority is granted to the Union, to which a, similar authority in the States would be absolutely and totally contradictory and repugnant, there the authority to the. Federal government, is; necessarily exclusive, and the same power cannot be constitutionally exercised by the States.” (p. 574.)
In Houston v: Moore, 5 Wheat. 23, the court say: — “ We are altogether incapable of comprehending, how two distinct, wills can, at the same timé, be exercised in relation to the same! subject, to be effectual, and at the same time compatible with one another.’?
The court, again, in treating, of the commercial power, say, in Gibbons v. Ogden, Wheat. 196;; — “ It is the power.to? regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress* is complete in itself, may be exercised to its utmost extent, and *395 acknowledges no limitations, other than are- prescribed in the Constitution.” “ The sovereignty of Congress, though limited to specified objects, is plenary as to those objects.” “ The power over commerce with foreign nations and among the several States is vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions,” &c.. And in the same case, page 199: — “Where, then', each government exercises the power of taxation, neither is exercising the power of the other'; but when a State proceeds to regulate commerce with foreign nations, or among the several. States, it is exerbising the very power that is granted to Congress, and is doing the very thing which Congress is authorized to do.”
And Mr. Justice Johnson, who gave a separate opinion in the same case, observes, — “ The power to regulate commerce here meant to be granted was the power to regulate commerce which previously existed in the States.” And again, — “ The power to regulate commerce is necessarily exclusive,”
In Brown v. The State' of Maryland, 12 Peters, 446, the court say, — “It is not, therefore, matter of surprise that the grant of commercial power should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the States.” This question, they remark, “was considered in the case of Gibbons v. Ogden, in which it was declared to be complete in itself, and to acknowledge no limitations,” &c. And Mr. Justice Baldwin, in the case of Groves v. Slaughter, 15 Peters, 511, says, — “ That the power of Congress to regulate commerce among tp.e several States is exclusive of any interference by the States has been, in my opinion, conclusively settled by the solemn opinions of this court,,” in the two cases above cited. And he observes, — “ If these' decisions are not to be taken as the established construction of this clause of the Constitution, I know of none which are not yet open to doubt.”
Mr. Justice Story, in the case of New York v. Miln, 11 Peters, 158, in speaking of the doctrine of concurrent power in the States to regulate commerce,' says, that, in the case of Gibbons v. Ogden,- “ it was deliberately examined and deemed inadmissible by the court.” “ Mr. Chief Justice Marshall, with his accustomed accuracy and fulness of illustration, reviewed, at that time, the whole grounds of the controversy; and from that time to the present, the.question has been considered, so far as I know, at rest. The power given to Congress to regulate commerce with foreign nations and among thé States has been deemed exclusive, from the náture and objects of the power, and .the necessary implications growing out. of its exercise.”
*396 When the commercial power was under discussion in the convention which formed the Constitution, Mr. Madison observed, that “ he was more and more convinced that the regulation of commerce was in its nature' indivisible, and ought to be wholly under one authority.” Mr. Sherman said, — “The power of the United States to regulate trade, being supreme, can Control interferences of the State regulations vvhen such-interferences happen; so that there is no danger to be apprehended .from a concurrent jurisdiction.” Mr. Langdon “ insisted that the regulation of-tonnage was an essential part of the regulation of trade, and that the States ought to have nothing to do with it.” And the motion was carried', “ that no State shall lay any duty on tonnage without the consent of Congress.” (3 Madison Papers, 1585, 1586.)
The adoption of the above provision in the Constitution, and also the one in the same'section, — “ that no State shall, without the assent of the Congress, lay any imposts or duties on imports or'exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts shall be for the use of the treasury of the United States; and ail such laws shall be subject to the revision and control of the Congress,” —is a restriction, it is contended, upon the acknowledged power of the States.
The force of this argument was admitted by the. court in the case of Gibbons v. Ogden, arid, it was answered‘by the allegation, that tlje restriction operated on the taxing power of the States. The same argument was used in the thirty-second number of the Federalist. I yield more to the authority of this position than to the stringency of the argument in support of it. To prohibit the exercise of a power by'a State, as a general rule, admits the existence of such-power. But this may not be universally true. Had there been no inhibition on the .States as to “ coining money and fixing the value thereof,” or as to tonnage duties, it could not have been successfully contended that the States might exercise-those powers. All duties are required to be uniform, and this could not be the result of State action, And the power to coin money' and regulate its value, for the Union, is equally beyond the power of a State.
Doubts may exist as to the true construction of an instrument in the minds of its framers, and to obviate those doubts, additional, if not unnecessary, provisions may be inserted. This remark applies to the- Constitution in the instances named, and in others.
A concurrent power in the States to regulate commerce is an anomaly hot found in the Constitution. If such power exist, it may be exercised independently of the federal authority.
*397 It does not follow,-as is often said, with little accuracy, that, when a State law shall conflict with an act of Congress, the former must yield. On the contrary, except in certain cases named in the Federal Constitution, this is never correct when the act of the State is strictly within its powers.
I am aware this court have held that a State may pass a bankrupt law, which is annulled when Congress shall act on the same subject. In Sturges.v. Crpwninshield, 4 Wheat. 122, the court say, — “ Wherever the terms in which a power is granted by the Constitution to Congress, or wherever the nature of the power itself, requires that it shall be exclusively exercised by Congress, the subject is as completely taken away from State legislatures as if they had been forbidden to act upon it.'” But they say, — “ The power granted to Congress of establish^-ing uniform laws-on the subject of bankruptcy is not of this description.”
The case of Wilson v. The Blackbird Creek Marsh Company, 2 Pet. 250, it is contended, recognizes the right of a State to.exercise a commercial power, where no conflict is produced with an aet of Congress.
It must be admitted that the language of the eminent chief justice who wrote the opinion is less guarded than his opinions generally were on constitutional questions.
A company was incorporated and authorized to.construct a dam over Blackbird Creek, in the State of Delaware, below where the tide ebbed and flowed, in order to drain the' marsh,, and by that means improve the health of the neighbourhood. The plaintiffs, being desirous of ascending the creek, with their vessel^ above the dam, removed a part of it as an obstruction,, for which the company recovered damages. The chief justice-in speaking of .the structure of the dam, the drainage of the marsh, and the improvement of the health of the neighbour-hood, says: — “ Means calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a'navigable creek, and must be’ .supposed to abridge-the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the-government of Delaware and its citizens, of which this court can take no cognizance.” And he observes; — “If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the abject of which was to control State legislation over those small navigable creeks into which the tide flows,” &c., “we should feel not *398 much difficulty in saying that a State law coming in conflict with such act would he voidi But Congress had passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, aod among the several' States, — a power which has not been so exercised as to affect the question.”
The language of the chief justice must be construed in reference to the question before the court; to suppose that he intended to lay down the general proposition, that a State might pass any act to obstruct or regulate commerce which did not come in conflict with an act of Congress, would not only be unauthorized by the language used, and the facts of the case beiore the court, but." it would contradict the language of the court in Gibbons v. Ogden, Brown v. Maryland, and every case in which the commercial power has l een considered.
The chief justice was speaking of'a creek which falls into the Delaware, and admitted in the pleadings to be navigable, but of so limited an extent that it might -Well be doubted whether the general regulation of commerce could apply to it. Hundreds of creeks within the flow of the tide were similarly situated. In such cases, involving doubt whether the jurisdiction may not be exclusively exercised by the State, it is politic and prooer in the judicial power to follow the action of Congress. Over the navigable waters of a State, Congress can exercise no .commercial power, except as regards an intercourse with other States of the Union or foreign countries. And doubtless there are many creeks made navigable by the flowing of the tide, or by the backwater from large rivers, which the general phraseology of an act to regulate commerce may not embrace.' In all such cases, and many others that may be found to exist, the court could not safely exercise a jurisdiction not expressly sanctioned by-Congress.
When the language of the court is applied to the facts of the ,above case, no such general principle as contended for is sanctioned. The construction of the dam was complained of, not as a regulation of commerce, but an obstruction of it; and the court held, that, “ as Congress had not assumed to control State legislation over those small navigable creeks into which the tide flows, the judicial power could not do so. The act' of the State was an internal and a police power, to guard the health of- its citizens. By the erection of the dam, commerce could only be affected as charged consequentially and contingently. The State neither assumed nor exercised á commercial power: In this whole case, nothing more is found than a forbearance to exejcise power over a doubtful object, which should ever characterize the judicial branch of the government.
*399 A-concurrent power excludes the idea of a dependent power. :The general government and a State exercise concurrent powers in'taxing the people of the State. The objects of taxation may be the same, but the motivés and policy of the tax are different, and the powers are distinct and independent. A concurrent power in two distinct sovereignties to regulate the same thing is as inconsistent in principle as it is impracticable in action. It involves a moral and physical impossibility. A joint action is not supposed, and two independent wills cannot do the same thing. The action of one, unless- there be an arrangement, must necessarily precede the action of the other 5 and that which is first, being competent, must establish the rule. If the powers be equal; as must be the case, both being, sovereign, one may'undo'what .the other does, and this must be the result of their action.
But thé argument is, that a State acting in a subordinate capacity, wholly inconsistent with its sovereignty, may regulate foreign commerce until Congress shall act on the same subject and that the State must then yield to the paramount authority. A jealousy of the federal powers has often been expressed, and an apprehension entertained that they would impair the sovereignty of the States: But this argument degrades the States by making their legislation, to the extent-stated, subject to the will of Congress. State powers do not rest upon this basis. Congress can in no respect restrict or enlarge State powers, though they may adopt a State law. State powers are at all times and under all circumstances exercised independently of the- general government, and are never declared void or inoperative except when they transcend State jurisdiction. And on the same principle, the Federal authority is void when exercised beyond its constitutional limits.
The organization of the militia by a State, and also a State bankrupt law, may be superseded by the action of Congress, But this is not within the above principle. The action of the State is local, and may be necessary on both subjects, and that of Congress is general. In neither case is the same power exercised. No one doubts the power of a State to regulate its internal commerce.
It has been well remarked, that the regulation of commerce consists as much in negative as in positive action. There is not a Federal power which has been exerted in all its diversified means of operation. And yet it may have been exercised by Congress, influenced by a judicious policy and the' instruction of the people. Is a commercial regulation open to-State action because the Federal power has not been exhausted ? No ingenuity can provide for every contingency; and if it *400 could, it might' not. be wise to do so. Shall free • goods be taxed by a State because Congress have not taxed them ? Or shall a State increase the duty, on the ground that it is toó low ? Shall passengers, admitted by act of Congress without a tax, be taxed by a State ?• ■ The supposition of such a power in a State is utterly inconsistent, with a commercial power, either paramount or exclusive, .in Congress.
That it is inconsistent with the exclusive power will be admitted ; but the exercise of a subordinate commercial power by a State is contended for. When this power is exercised, how can it be known that the identical thing has not been duly considered by Congress ? And how can Congress, by any legislation, prevent this interference ? A practical enforcement of this system-, if system it may be called, would ovérthrow the Federal commercial' power-.
Whether I consider the nature and object of the commercial power, the class of powers with which it. is placed, the decision of this court in the case of Gibbons v. Ogden, reiterated in Brown v. The State of Maryland, and often reasserted by Mr. Justice.Story', who participated in those decisions, I am brought to the conclusion, that the power “ to regulate commerce with foreign nations, and among the several States,” by the Constitution, is exclusively vested in Congress.
I come now to inquire, under the second general proposition, Is the statute of New York a regulation of foreign commerce ?
All commercial action within the limits, of a State', and which does not extend to any other State or foreign country, is exclusively under State regulation. Congress have no more power ‘to control this than a State has to regulate.commerce “with foreign nations and among the several States.” And yet Congress may tax the property within a State, of every description, owned by its citizens, on the basis provided in the Constitution, the same as a State may ta,x it. But if Congress should impose a tonnage duty on vessels which' ply between ports Avithin the same State, or require such vessels to take out a license, or impose a tax on persons transported in them, the act would be unconstitutional .and void. But foreign commerce and com-, merce. among'the several States, the regulation of which, with certain constitutional exceptions, is exclusively vested in Congress, no State can regulate.
In giving the commercial power to Congress the States did not part with that power of self-preservation which must be inherent in every organized community. They may guard against the introduction of any thing which, may corrupt the morals, or endanger the health or lives of their ¿citizens. • Quarantine or health laws have been passed by the States, and regulations of police for their .protection and welfare.
*401 The inspection laws of a State apply chiefly to exports, and. the State may lay duties and. imposts on imports or exports to pay the expense of executing those laws. But a State is limited to what shall he ‘‘ absolutely necessary*” for that- purpose. And still further to guard against the abuse of this power, it is declared that “ the net produce of all duties and imposts laid by a State on imports or exports- shall be for the use of the Treasury of the United States ; and all such laws shall be subject to the revision and control of Congress.”
The caiitious manner in which the exercise of this commercial power by a State is guarded shows an extreme jealousy of. it by the convention; and no doubt the hostile regulations of commerce by the States, under' the Confederation, had induced this jealousy. No one can read this provision, and the one which follows it in relationto tonnage duties, without being convinced that they cover, and were intended to cover, the entire subject of foreign commerce. A criticism on the term import, by which to limit the obvious meaning of this paragraph, is scarcely admissible in construing so grave, an instrument.
Commerce is defined to be “ an exchange of commodities'.” But this definition does not convey the full meaning of the term. It includes “navigation add intercourse.” .That the transportation of passengers is a part of commerce is not how an open question. In Gibbons v. Ogden, this court say, — “ No clear distinction is perceived between the powers to regulate vessels in transporting men for hire and property for hire.” The provision of the Constitution, that “ the migration or importation of such persons as any of the States now existing shall think proper to admit shall not be prohibited by Congress prior to- the year 1808,” is a restriction on the general power of Congress to regulate .commerce. In reference to this clause, this court.say, in the above case, — “This section proves that the power to regulate commerce applies equally to the regulation of vessels employed in transporting -men who .pass from place to place voluntarily, and to those who pass involuntarily.”
To encourage foreign emigration was a cherished policy of this country at the time the Constitution was adopted. 'As a branch of commerce the transportation of passengers has always given a profitable employment to our ships, and within a few years past has required an amount of tonnage nearly equal to that of imported merchandise.-
Is this great branch of our commerce left open to State regulation on the ground that . the prohibition refers to an import,' and a man is not an import ?
Pilot.laws, enacted by the different States, have been refer *402 red to as commercial regulations. That these laws do regulate commerce, to a certain extent, is admitted ; but from what authority do they derive their force ? Certainly not from the States. By the fourth section of the act of the 7th of August, 1789, it is provided, — “ That all pilots in the bays, inlets, rivers, harbours, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may he, or with such laws as the States may-respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress.” These State , laws, by adoption, are the laws of Congress, and as such effect is given to them. So the laws of the States which'regulate the practice of their courts, are adopted by Congress to regulate, the practice of the Federal' courts. But these laws, so far as they gre adopted, are as -much the laws of the United States, and it has often been so held, as if they had been specially enacted by Congress. A repeal • of them by the State, unless future changes in the act's be also adopted, does not affect their force in regard to Federal action.
.In the above instances, it has been deemed proper for Congress to legislate by adopting the law of the States. And it is not doubted that this has been found convenient to the putuic service. Pilot laws were in force in .every commercial State on the seaboard when the Constitution was adopted; and on the introduction of sa new system, it was prudent to preserve, .as far as practicable, the modes of proceeding with which the ■ people of the different States were familiar. In regard to pilots, it was not .essential that the laws should be uniform, — their duties could be best regulated by an authority acquainted with the local circumstancés under which they were performed; and the fact that the -same system is continued shows that the public interest has required no change.
No one has yet drawn the line clearly, because,, perhaps, no one can draw it,- between the commercial power of the Union and' the municipal power of a S'tate. Numerous cases have arisen, involving these powers, which have been decided, but a rule .has necessarily been observed as applicable to the circumstances of each case.- -And so must every case be adjudged.
A State cannot regulate foreign commerce, but it may' do many things which more or less affect it. -It may tax a ship or other vessel used in. commerce the same as other property owned by' its citizens. A State may tax the stages in which the mail is transported, but this does not regulate the conveyance of the mail any more than taxing á ship regulates commerce. And yet, in both instances, the tax on the property in some degree affects its use.
*403 An inquiry is made whether Congress, under “the power to regulate commérce among the several States,” can impose a tax for the use of canals, railroads, turnpike roads, and bridges, constructed by a State .or its citizens ? I xnswer, that Congress has no such power. The United States .cannot use. any one of these works without paying the customary tolls. The tolls are imposed, not as a tax, in the ordinary senso of that term, but ag compensation for the increased facility afforded by the improvement.
■ The act of New York now under consideration is called a health law. It. imposes a tax on ■ the master and every cabin passenger of a vessel from a foreign port, of one dollar and fifty cents; and of one dollar On the.mate, each steerage passenger; sailor, or mariner. And the master is made responsible for the tax, he having a right to exact it of the others, The funds so collected are denominated hospital moneys, and aré applied to the use of the marine hospital; the surplus to be paid to the treasurer of the Society for the Reformation of Juvenile Delinquents in the city of New, York,-for the use of that society.
To call this á health law would seem to.be a misapplication of the term. It is difficult to perceive how a health law can-be extended to the reformation of juvenile offenders. On • the same principle,, it may be made to embrace all offenders, so as to pay the expenses incident to an administration of the. criminal law. And with the same propriety it may include the expenditures of any branch of the civil administration of the city of.New York, or of the State.. In fact, I .can' see no principle on which the fund can be limited; if it may be used as authorized by the act. The amount of the tax is as much ..within the discretion of the-legislature of New York as the objects to which, it may be applied.
It is insisted that if the act, as regards the hospital t fund, pe withih the power of the Státe, the application of a part of the fund to other objects, as provided in the act, cannot make it unconstitutional. This argument is unsustainable. If the State has power to impose a tax to defray the necessary expenses of a health regulation, and this power being exerted, can the tax be increased so as to. defray, the expenses of the State government ? This is within the principle asserted.
The case of The City of New York v. Miln, 11 Peters, 102, is relied on with great confidence as sustaining the act in question. . As I assented to the points ruled in that cage, consistency, unless convinced of having erred, will compel me to support the law now before us, if it be the same in principle,-. The law in Miln’a case required that “ the master or commander of any ship or other Vessel arriving, at the port of New York shall, *404 within twenty-four hours after his arrival, make -a report, in writing, on oath or affirmation, to the mayor of the city of New York, of the name, place of birth and last legal settlement, age, and occupation of every person brought as a passenger; and of all persons permitted to land at any place during the voyage, or go on board of some other vessel, with the intention of proceeding to said city; under the penalty on such master or commander, and the owner or owners, consignee or consignees, of such ship or vessel, severally and respectively, of seventy-five dollars for each individual not so reported.” And the suit was brought against Miln as consignee of the ship Emily, for the failure of the master to make report of the passengers on board of his vessel.
In their .opinion this court say, — “The law operated on the territory of New York, over which that State possesses an acknowledged and undisputed jurisdiction for every purpose of internal regulation”; and “on persons' whose<rights and duties are rightfully prescribed and controlled by the laws of the respective States, within whose territorial limits they are found.” This law was considered as an internal police regulation, and as not interfering with commerce:
■ A duty was not laid upon the vessel or the passengers, but the report only was'required from the .master, as above stated. Now, every State, has an unquestionable right to require a register of the names of the persons who come within it to reside temporarily or permanently. This was a precautionary measure to ascertain the rights of the individuals, and the obligations of the public, under any contingency which might occur. It opposed no obstruction'to commerce, imposed no-tax nor delay, but acted upon the master, owner, or consignee of the vessel, after the termination of the voyage, and when he was within the territory of the State, mingling' with its citizens, and subject to its laws.
' But the health law, as it is called, under consideration, is altogether different in its objects and means. It imposes a tax or duty on the passengers, officers, and sailors, holding the master responsible for the amount at the immediate termination of the voyage, and necessarily before the passengers have set their feet on land. The' tax on each passenger, in the discretion of the legislature, might have been; five or ten dollars, or any other sum, amounting even to a prohibition of the transportation of passengers ; and the professed object of the tax is as welf for the benefit of juvenile offenders, as for the marine hospital. And it is not denied that a considerable sum thus received has been .applied to the former object. Thé amount and application of this tax are only important to show the consequences of the exercise of this power by the States. The principle involved is vital to the commercial nower of the Union.
*405 The transportation of passengers is regulated by Congress. More than two passengers for every five tons of the ship or vessel are prohibited, under certain penalties; and the master is required to report to the collector a list of the passengers from a foreign port, stating the age, sex, and occupation, of each, and the place of their destination. In England, the same subject is regulated by act of Parliament, and the same thing is done, .it is believed, in all commercial countries. If the transportation of passengers be a branch of commerce, of which there can be no doubt, it follows that the act of New York, in imposing, this tax, is a regulation of commerce. It is a tax upon.a commercial operation, — upon what may, in effect, be called an import. In a commercial sense, no just distinction can be made, as regards thelaw in question, between the transportation of merchandise and,passengers. For the transportation of both the ship-owner realizes a profit, and each is the subject of a commercial regulation by Congress. When the merchandise is taken from the ship, and becomes mingled with the property of the people of the State, like other property, it is subject to the local law; but until this shall take place, the merchandise. is an import, and is not subject to the taxing power of the State, and the same rule applies to passengers. When they leave the ship, and mingle with the citizens of the State, they become subject to its laws.
In Gibbons -v. Ogden, the court held that the act of laying “ duties or imposts on imports or exports ” is derived .from the taxing power; and they lay much stress on the fact, that this power is given in the same sentence as the power to “ lay and collect taxes.” “ The power,” they say, “ to regulate commerce is given ” in a separate clause, “ as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred ”; and they remark, that, had not the States been prohibited, they migM, under the power to tax, have levied “duties on imports or exports.” (9 Wheat. 201.)
The Constitution requires that all “ duties and imposts shall be uniform,” and declares that “no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another.” Now, it is inexplicable to me how thirteen or more independent States could tax imports under these provisions of the Constitution. ■ The tax must be uniform throughout the Union; consequently the exercise of the power by any one State would be unconstitutional, as it would destroy the uniformity of the tax. To secure this uniformity was one of the motives which led to the adoption csf the Constitution. The want of it produced collisions in the commercial regulations of the States. But if, as is contended, these *406 provisions of the Constitution operate only on thé Federal government, and the States are free to regulate commerce by taxing its operations in all cases' where they are not expressly prohibited, the Constitution has failed to accomplish the great object of those who adopted it.
These provisions impose restrictions on the exercise of'the. commercial power, which was exclusively vested in Congress; and it is as binding on the States as any other exclusive po'wer with which it is classed in thé 'Constitution.
/It is immaterial under what power duties on imports are imposed. That they-are the principal means .by which commerce is regulated no one can question. Whether duties shall be imposed with the view to protect our manufactures, or. for purposes of revenue’only, has always been a leading subject of discussion in Congress ; and also what foreign articles may .be admitted free of duty. The force of the argument, that things untouched by the regulating power have been equally considered with those of the same class on which, it has operated, is not admitted by the counsel for the defendant. Biit does not all experience sustain, the argument ? A large amount of foreign articles brought: into this country for several yearn have been admitted free of duty. Have not these articles been considered by Congress ? The discussion in both houses of Congress, the report by the committees of both, and the laws that have been enacted, show that they have been duly considered.
• Except to guard its citizens against diseases and paupers, the municipal power of a State cannot prohibit the introduction of' foreigners brought to this country'under the authqrity of Congress. It may deny to them a residence, unless they shall give security to indemnify the public should they become paupers. The Slave States have the power, as this court held in Groves v. Slaughter, to prohibit slaves from being brought into them as merchandise, ' But this was on the ground, that such a prohibition did not come within the power of Congress to regulate commerce among the Several'States.” It is suggested that, under this view of the commercial power, slaves may be introduced into the Free States. Does any one suppose that Congress can ever revive the slave-trade ? And if this were possible, slaves thus introduced would be free.
As early as May 27th, 1796, Congress enacted, that “the President be authorized to direct thé revenue-officers commanding forts and revenue-cutters to aid in the execution of quarantine, and also in the execution of the health laws of the States respectively.” And by the aet of February 25th, .1799, which repealed the above act, more "enlarged provisions were enacted/ requiring the- revenue-officers of the United States to conform- *407 to and aid in the execution of the quarantine and health laws of the States. In the first section of this law there is a proviso, that “ nothing therein, shall enable any State to collect a duty of tonnagé or impost without the consent of Congress.”
A proviso limits the provisions of the act into which it is introduced. But this proviso may he considered as hot restricted to this purpose. It shows with what caution Congress guarded the commercial power, and it is an authoritative provision against its exercise by the States. An impost, in its enlarged sense, means any tax or tribute imposed by authority, and applies as well to a -tax on persons as to a tax on merchandise. In this sense it was no doubt used in the above act. Any other construction would be an imputation oh the intelligence of Congress.
If this power to tax passengers from a foreign country be-io'ngs to a State, a tax, on the same principle, may be imposed on all persons coming into or passing through it from any other State of the Union. And the New York statute does in fact lay a tax on passengers on board of any coasting-vessel which arrives at the port of New Y ork; with an exception of passengers in vessels from New Jersey; Connecticut, and Rhode Island, who are required to pay for one trip in each month. All other passengers pay the tax every trip.
If this may be done in New York, every other State may do the same, on all the lines of our internal navigation. Passengers on a steamboat which plies on the Ohio, the Mississippi, or on any of our other, rivers, or on the Lakes, may be required to pay a tax, imposed at'the discretion of each State within which the boat shall touch. . And the same principle will sustain a right in every State to tax all persons who shall pass through its territory on railroad-cars, canal-boats, stages, or in any other manner. This would enable a State to establish and enforce a non-intercourse with every other State.
The. ninth section of the first article of the Constitution declares, — “ Nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another.” But if the commercial, power of the Union over foreign commerce does not exempt passengers brought into the country from State taxation, they can claim no exemption under the exercise of the same power among the States. In McCulloch v. The State of Maryland, 4 Wheat. 431, this court say, — “ That there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which- other, with respect to those very measures, is declared to be supreme over that which exerts' the control, is a proposition not to be denied.”
*408 The officers and crew of the vessel are as, much the instruments of commerce as the ship, and yet they are taxed under this health law of New York as .such instruments. The pas*r sengers are taxed as passengers, being the subjeets 'of commerce from a foreign country. By the fourteenth ¿rtiele of the treaty of 1794, with England, it is stipulated that the people of each country may freely come, with their ships and cargoes,- to the other, subject only to the laws and statutes of the two countries respectively. The statutes hére referred to are those of the Federal government, and not of the States. The, general government only is known in our foreign intercourse..
By the forty-sixth section of the act of March, 1799, the wearing apparel and other personal baggage, and the tools Or implements of a mechanical trade, from a foreign port, are admitted free of duty. These provisions of the treaty and of the act are still in force, and they have a strong bearing on this sulv ject. They aré, in effect, repugnant to the act of New York.
It is pot doubted that a large portion, perhaps nine, tenths, of the foreign passengers landed at the port of New York pass through the State to other places of residence. ■ At such places, therefore, pauperism must be increased much more by the" influx of foreigners than in the city of. New York. If, by reason of commerce, a burden is thrown upon our commercial cities, Congress should make suitable provisions for their relief. And I have no doubt this will be done.
The police power of the State-cannot draw within its jurisdiction objects which lie beyond it. It meets the commercial power of the Union in pealing with subjects under the protection of that power, yet it can only be exerted under peculiar emergencies and to a limited extent. . In guarding the safety, the health, and morals of its citizens, a State is restricted to appropriate and constitutional means. If extraordinary expense .be incurred, an equitable claim to an indemnity can give no power to a State to tax objects not subject to its jurisdiction.
The Attorney-General of New York admitted, that,'if the commercial power were exclusively vested in Congress, no part of it can be exercised by, a State. The soundness- of this conclusion is not only sustainable by the decisions of this court, but by every approved rule of construction. That, the power is exclusive seems to be as fully established as any other power under the Constitution which has been controverted.
A tax or duty upon tonnage, merchandise, or passengers is a regulation of commerce, and cannot be laid by a State, except under the sanction of Congress and for the- purposes’ specified in the Constitution. On the subject of foreign commerce, including the transportation of passengers, Congress have adopted *409 such regulations as they deemed proper, taking into view our relations with other countries. And this covers the whole ground. The act of New York which imposes a tax on pás-sengers of a ship from a foreign port, in the manner provided, is a regulation of foreign commerce, which is exclusively vested in Congress; and the act is therefore void.
Norris v. City of Boston.
This is a writ of error, which brings, before the court the judgment of the Supreme Court of the State of Massachusetts.
“ An act relating to alien passengers,” passed the 20th of April, 1837, by the legislature of Massachusetts, contains the' following provisions: —
“ <§> 1. When any vessel shall arrive at any port or harbour within this State, from any port or place without the same, with alien passengers on board, the officer or Officers whom the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land such passengers, are hereby authorized and required to appoint, shall.go on board such vessels and examine into the condition of said ^passengers.
“ $ 2. If, on such examination, there shall be found among said passengers any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the officer so examining, to maintain themselves, or who have been paupers in any other country, no such alien passenger shall be permitted to land, until the master, owner,‘consignee, or agent of such vessel shall have given to such city or town a bond in the sum of one thousand dollars, with good and sufficient security, that no such lunatic or indigent passenger shall become a city, town, or State charge within ten years from the date of said bond.
“ § 3. No alien passenger, other than those spoken of in the preceding section, shall be permitted to land, until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars tor each passenger so landing ; and the money so collected, shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers.”
The plaintiff being an inhabitant of St. John’s, in the Province of New Brunswick and kingdom of Great Britain, arrive ing in the port of Boston, from that place, in command of a schooner called the Union Jack, which had on board nineteen alien passengers, for each of which two dollars were demanded of the plaintiff, and paid by him, on protest that the exaction was illegal. An. action being brought, tti recover back this *410 money, against the city of Boston, in the Court of Common Pleas, under the instructions of the court, the jury found a verdict for the defendant, on.which judgment was entered; and which was affirmed on a writ of error to the'Supreme Court.
Under the- first and second sections of the above , act, the persons appointed may go on board of a ship from a foreign port, which .arrives at the port of Boston with alien passengers on board, and examine whether any of them are lunatics, idiots, maimed, aged, or infirm, incompetent, to maintain themselves, or have 'been paupers in any other country, and not permit' such persons to be put on shore, unless security shall be given that they shall not become a city, town, or State charge. This is the exercise of an unquestionable power in the State to protect itself from foreign paupers and other persons who would be a public charge; but the nineteen alien passengers.for whom the tax was paid did not come, nor any one of them, within the second section. The tax of two dollars was paid by the master for each of these passengers before they were permitted to land. This, according to the view taken in the above case of Smith v. Turner, was a regulation of commerce, and not being within the power of the State, the act imposing the tax is void.
The fund thus raised was no doubt faithfully applied for the support of foreign paupers, but the question is one of power, and not of policy. The judgment of the Supreme Court, in my opinion, should be'reversed, and this cause be remanded to that court, with instructions to carry out the judgment of this court.
Mr. Justice WAYNE.
Norris v. City of Boston, and Smith v. Turnek.
I agree with Mr. Justice McLean, Mr. Justice Catron, Mr. Justice McKinley, and Mr. Justice Grier, that the laws of Massachusetts and New York, so far as they are iri question in these cases, aré unconstitutional and void. I would not say so, if I had any, the least, doubt of it; for I think it obligatory upon this court, when there is a doubt of the unconstitutionality of a lavf, that its judgment should be in favor of its validity. I have formed my conclusions in these cases with this admission constantly in mind.
Before stating, however, what, they are, it will be well for me to say, that the four judges and myself who concur in giving the judgment in- these cases do not differ in the grounds upon which our judgpient ■ has been formed, except in one particular," in no way at variance with our united Conclusion; *411 and that is, that a majority of us do hot think it necessary in these cases to reaffirm, with our brother McLean, what this court has long since decided, that the constitutional power to' regulate “commerce with foreign nations, and among the several States, and with the Indian tribes,” is exclusively vested in Congress, and that no part of it can be exercised by' a State.
I believe it to be so, just as it is expressed in the preceding sentence. And in the sense in which those words were used by. this court in the case of Gibbons v. Ogden, 9 Wheat. 198. All that was decided in that_case remains unchanged by any sub- ■ sequent opinion or judgment of this court. Some of the judges of it have, in several cases, expressed opinions that the power to regulate commerce is not exclusively vested in Congress. But they are individual opinions, without judicial authority to overrule the contrary conclusion, as it was given by this court in Gibbons v. Ogden.
Still, I do not think it necessary to reaffirm that position in, these cases, as a part of our judgments upon them. Its.exclusiveness in Congress will, it is true, be an unavoidable inference from some of the arguments which I shall use upon the power of Congress to regulate commerce; but it will be seen that the argument, as a whole, will be a proper and apt foundation for the conclusion to which five of us have come,— that the laws of Massachusetts and New York, so far as they are resisted by the plaintiffs in the cases before us, are tax acts, in the nature of'regulations acting upon the commerce of the United States, such as no State can now constitutionally pass.
For the acts of Massachusetts and New York imposing taxes upon passengers, and for the pleadings upon which these cases have been brought to this court, I refer to the opinion of Mr. Justice, Catron. They are fully and accurately stated. I take pleasure in saying that I concur with him in all the points made in his opinion, and in his. reasoning in support of them. They are sustained by such minute references to the legislation of Congress and to treaty stipulations, that nothing of either is left to be added. As an argument, it closes this controversy against any other view of the subject-matter, in opposition to my learned brother’s conclusions.
His leading positions are, that the acts of Massachusetts and New York are tax or revenue acts upon the commerce of the United States, as that commerce has been regulated by the legislation of Congress and by treaty stipulations,- that the power to regulate commerce having been acted upon by Congress indicates how far the power is to be exercised for the United States as a nation, with which there can be no inter-- *412 ference by any State legislation; that a treaty permitting the ingress of foreigners into the United .States, with or without any other stipulation than a reciprocal right of ingress for our people into the territories of the nation with which the treaty may be made, prevents a State from imposing a poll-tax or personal impost upon foreigners, either, directly or indirectly, for any purpose whatever, as a. condition for being landed in any part of the United States, whether such foreigners shall come to it for commercial purposes, or as immigrants, or for temporary visitation.
■Those of us who are united with Mr. Justice Catron in giving the judgments in these cases concur with him in those opinions. Mr. Justice McKinley and Mr. Justice Grier have just said so, my own concurrence has be.en already expressed, and the second division of Mr. Justice McLean’s/opinion contains conclusions identical with those of Mr. Justice Catron concerning the unconstitutionality of the laws of Massachusetts and New York, on account of the conflict between them with the legislation of Congress and with treaty stipulations. I also concur with Mr. Justice McKinley in his interpretation of the ninth section of the first article of the Constitution; also with Mr. Justice G|ier, in his opinion in the case of Norris v. The City of Boston.'
I have been more particular in speaking of the. opinions of Messrs.. Justices McLean and Catron than I would otherwise have been, and of the points of agreement between them, and of the concurrence of Messrs. Justices McKinley and Grier and. myself in all in which both opinions agree, because a summary may.be made from them of what the court means to decide in the cases before us. In my view, after a very careful perusal of those opinions, and of those also of Mr. Justice McKinley and Mr. Justice Grier, I think the court means now to decide, —
1. That the_ acts of New York and Massachusetts imposing a tax upon passengers, either foreigners or citizens, coming into the ports in those States, either in foreign vessels or vessels of the United'States, from foreign nations or from ports in the “United States, are unconstitutional and void, being-in their nature regulations of commerce contrary to the grant in the Constitution to Congress of the power to regulate commerce with foreign nations and among the several States.
2. That the States of this Union cannot constitutionally tax the commerce of the United States for the purpose of paying any expense incident to the execution of their police laws; and.-that the commerce of the United States includes an intercourse of persons;'-as well as the importation of merchandise.
3. That the acts of Massachusetts and New York in question *413 in these cases conflict with treaty stipulations existing between the United States and Great Britain, permitting the inhabitants of the two countries “ freely and securely to come, with their ships and cargoes, to all places, ports, and rivers in the territoriés of each country to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of said territories, respectively; also, to hire and occupy house's and warehouses for the purposes of their' commerce, and generally the merchants and,, traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject, always, to. the laws . and statutes of the two countries, respectively ”; and that said laws are therefore unconstitutional and void.
_4. That, the Congress of the United States having by sundry acts passed at different times admitted foreigners into the United States with their personal luggage arid tools of trade free from all duty or imposts, the acts of Massachusetts and New York imposing any tax upon foreigners or immigrants for any purpose whatever, whilst the vessel is in transitu to her port of destination, though said vessel may have arrived within the jurisdictional limits of either of the States of Massachusetts or New York, and before the passengers have been landed, are in violation of said_acts of Congress, and therefore unconstitutional and void.
5. That the acts of Massachusetts and New York, so far as they impose any obligation upon the owners or consignees of vessels, .or' upon the captains of vessels or freighters of the samé, arriving in the ports of the United States within the said States, to pay any tax- or duty of any kind whatever, or to be' in any way responsible for the same, for passengers arriving" in the United States or coming from a port in the United States,.are unconstitutional and void; being contrary to the constitutional grant to Congress of the power to regulate commerce with foreign nations and among the several States, and to the legislation of Congress under the said power, by which • the United States have been laid off into collection districts, and ports of entry established within the same,' and commercial regulations prescribed, under which vessels, their cargoes and passengers, are to be admitted into the ports of the United States, -as well from abroad as from other ports, of the United States. That the act of .New York now in question, so far as it imposes a tax upon passengers arriving in vessels from other ports in the United States, is properly in this case before .this, court for construction, and that the said tax is unconstitutional and void. That the. ninth section of the first article of the Constitution includes within it the migration of other persons,
*414 as well as the importation of slaves, and in terms recognizes - that other persons as well as slaves may be the subjects of importation aiid commerce.
6. That the .fifth clause of the ninth section of the first article of the Constitution, which declares that “ no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another State; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another,” is a limitation upon the power of Congress to regulate commerce for the purpose, of producing entire commercial equality within the United States, and also a. prohibition upon the States t,o destroy such equality bjr any legislation prescribing a condition upon which vessels bound from one State shall enter the ports of another State.
• 7. That the acts of Massachusetts and New York, so far as they impose a tax upon passengers, are unconstitutional and void, because each of them so far conflicts with the first clause of the eighth section of the- first article of th’e Constitution, which enjoins that all duties, imposts, and excises shall be uniform throughout tbp United States; because the constitutional uniformity enjoined in respect to duties and imposts is as real and obligatory upon the States, in the absence of all legislation by Congress, as if the uniformity had been made by the legislation of Congress; and that such constitutional Uniformity is interfered with and destroyed by any State imposing any tax upon the intercourse of persons from State to State, or from foreign countries to the United States.
8. That the power in Congress to regulate commerce with foreign nations and among the .several States includes navigation upon the high seas, and in the bays, harbours, lakes, and navigable waters within the United States, and that any tax by a State in any way affecting the right of navigation, or subjecting the exercise of the right to a condition, is contrary to the aforesaid grant.
9. That the States of this Union may, in the exercise of their police powers, pass quarantine and health laws, interdicting vessels coming from foreign ports, or ports within the United States, from landing passengers and goods, prescribe the places- and time for vessels to quarantine, and impose penalties upon persons for violating, the same; and that such laws, .though affecting commerce in its transit, are not regulations of commerce prescribing terms upon which merchandise and persons shall be admitted into the ports.of the United States, but precautionary regulations to prevent vessels engaged in commerce from introducing disease into the ports to which they are bound, and that the States may, in the exercise of such police power, without *415 any violation of the power in Congress to regulate commerce, exact from the owner or consignee of a quarantined vessel, and from the passengers on board of her, such fees' as will pay to the State the cost of their detention and of the purification of the vessel, cargo, and apparel of the persons on board.
Having done what I thought it was right to do to prevent •hereafter any misapprehension of what the court now means to decide, I will give some reasons, in addition to those which have been'urged by my associates, in support of our common result. In the first place, let it be understood, that, in whatever I may say upon the' power which Congress has “ to regulate commerce with foreign nations, and among the several States, and with the Indian tribes,” the internal trade of a State is not meant to be included; that not being in any way within the regulating power of Congress.
In the consideration, too, of the power in Congress to regulate commerce, I shall not rely, in the first instance, upon what may be constitutionally done in many commercial ■ particulars, as well under the treaty-making power as by the legislation of Congress. My • first object is to show the plenitude of the power in Congress from the grant itself, without aid from any other clause in the Constitution. The treaty-making power for commercial purposes, however, and other clauses in the Constitution relating to commerce, may afterwards be iised to enforce and illustrate the extent and character of the power which Congress has to regulate commerce. It is a grant of legislative power, susceptible, from its terms and the subject-matter, of definite and indisputable interpretation.
Any mere comment upon the etymology of the words “ regulate ” and “ commerce ” would be unsatisfactory in such a discussion. But if their meaning, as they were used by the framers of the Constitution, can be made precise by the subject-matter, then it cannot be doubted that it was intended by them that Congress should have the legislative power to regulate commerce with foreign nations^ and among the several States, and with the Indian tribes, to the exclusion of any regulation for such commerce by any one of the States.
All commerce between nations is permissive or conventional. The first includes every allowance of it, under what is termed • by writers upon international law the liberty or freedom of commerce, — its allowance by statutes, or by the orders of any magistracy having the power to exercise the sovereignty of a nation in respect to commerce. Conventional commerce is, of course, that which nations carry on with each other under treaty stipulations. With colonial commerce — another distinct kind, between nations and their colonies, which the laws. *416 of nations permit the former to monopolize — we have nothing to do upon this occasion.
■ Now, what commerce was in fact, at least so far as European nations were concerned, had been settled beyond all dispute before our separation from the mother country. It was well known to the framers of the Constitution, in all its extent and variety. Hard denials of many of its privileges had taught them what it was. They were familiar with the many valuable works upon trade and international law which were written and published, and which had been circulated in England and in the Colonies from the early part of the last century up to the beginning of the Revolution. It is not too much to say, that our controversies with the mother country upon the subject had given to the statesmen in America in that day more accurate knowledge of all that concerned trade in all its branches and rights, and a more prompt use of it for any occasion, than is now known or could be used by the statesmen and jurists of our own time. Their knowledge, then, may well be invoked to measure the constitutional power of Congress to regulate commerce. .
Commerce between nations or among states has several branches. Martens, in his Summary of the Laws of Nations says, ■— “ It consists ill selling the superfluity; in purchasing articles of necessity, as well productions as manufactures; in buying from one nation and selling to another, or in transporting thé merchandise from the seller to the buyer to gain the freight.”
“ Generally speaking, the commerce in Europe is so far free, that no nation refuses positively and entirely to_ permit the subjects of another nation, when even there is no. treaty between them, to trade with its possessions in or out of Europe, or to establish themselves in its territory for that purpose. A state of war forms here a natural exception. However, as long as there is no treaty existing, every state retains its natural right to lay on such commerce whatever restriction it pleases. A nation is then fully authorized to prohibit the entry or exportation of certain merchandise, to institute customs and to augment them at pleasure, to prescribe the manner in which the commerce with its dominions shall be carried on, to point out the places v/here it shall be carried on, or to exempt from it certain parts of its dominions, to exercise freely its sovereign power over the foreigners living in its territories, to make whatever distinctions between the nations with whom it trades it may find conducive to its interests.”
In all of the foregoing particulars Congress may act legislatively. It is conceded that the States may not do so in any *417 one of them; and if, in virtue of the power to lay taxes, the United States and-the States may act in that way.concurrently ■upon foreigners when they reside in a State, it does not follow that the States may impose a personal impost upon them, as the condition of their being permitted to land in a port of the United States. “ Duties on the ent y of merchandise are to be paid indiscriminately by foreigners as well as subjects. Personal imposts it is customary not to exact from foreigners till they have for some time been inhabitants of the state.” (Martens, p. 97.).
. Keeping, then, in mind what commerce is, and how far a nation may legally limit her own commercial transactions with another state, we cannot be at a loss to determine, from the subject-matter of the clause in the Constitution, that the meaning of the terms used in it is to exclude the States from regulating commerce in any way, except their own internal trade, and to' confide its legislative regulation completely and entirely to Congress. When I say completely and entirely to Congress, I mean all that can be included in the term “ commerce among the several States,” subject, of course, to the right of the States to pass inspection laws in the mode prescribed by the Constitution, to the prohibition of any duty upon exports, either from one. State to another State or to foreign countries, and to that commercial uniformity which the Constitution enjoins respecting all that relates to the introduction of merchandise into the United States, and those who may bring it for sale, whether they are citizens or foreigners, and all that concerns navigation, whether vessels are employed in the transportation of passengers or freight, or both, including, also, all the regulations which the necessities and safety of navigation may' require. “Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike-roads, ferries, &c., are component parts of that immense mass of legislation which embraces every thing within the territory of a State not surrendered to the general government.”
But the conclusion derived from the. subject-matter of the clause, as I have just stated it, is strengthened particularly by what may be done in respect to commerce -by treaty, and by other clauses in the Constitution relating to commerce. Martens (p. 151) says, — “ The mere general liberty of trade, such as it is acknowledged at present in Europe, being too vague to secure to a nation all the advantages it is necessary it should-derive from its commerce,, commercial powers have been obliged to have recourse to treaties for their mutual benefit. The number of these treaties is considerably augmented since the *418 sixteenth century. However they may differ in their conditions, they turn generally on these three points: — 1. On commerce .in time of peace. 2. On the measures to he pursued with respect to commerce and commercial subjects in case of rupture between the parties. 3. On the commerce of the contracting .party that may happen to remain neuter, while the other contracting party is at war with a third power. .With respect, to the first point the.custom is, — 1. To settle in general the privileges that the contracting powers grant reciprocally to their subjects. 2. To enter .into the particulars of the rights to be enjoyed by their subjects,- as well with respect to their property as to their personal rights. Particular care is usually taken to provide for the free enjoyment of their reíigion ; for their right to the benefit of the laws of the country; for the security of the books of commerce, &c. 3. To mention spe-
cifically the kinds of merchandise which are to be admitted, to be imported or exported, and the advantages to be granted relatively to customs, tonnage, &c.
“ With respect to the rights and immunities in case of a rupture between the parties, the great objects to be obtained are, — 1. An exemption from seizure of the person or effects of ' the subjects residing in the territory of the other contracting power. 2. To fix the time which they shall • have to remove with their property out of the territory. 3. Or to point out the conditions on which they inay be permitted to remain in the enemy’s country during the war.
“In specifying the rights of commerce to be enjoyed by the neutral power, it is particularly necessary,.— 1. To exempt its vessels from embargo. 2. To specify the merchandise which is to be accounted contraband of war, and to. settle the penalties in case of contravention. 3. To' agree on the manner in which vessels shall be searched at sea. 4. To stipulate whether neutral'bottoms are ’to make neutral goods or not.”
It seems to me, when such Regulations of commerce as may be made by treaty are considered in connection with that clause in the Constitution giving to Congress the power to regulate it by legislation, and also in connection with the restraints upon the States in the'tenth section of the first article of the Constitution, in respect to treaties and commerce, that the States have parted with all power over commerce, except the regulation of their- internal trade. The restraints in that section are, that no State shall enter into any treaty, alliance, or confederation ; no State shall, without the G ttsent of Congress, lay any duties on imports or exports, except what may be necessary for executing its inspection laws; no State shall, without the consent of Congress, lay any duty of -tonnage, *419 or enter into any agreement, or compact with another State or with a foreign power.
The States, then, cannot regulate commerce by a treaty or compact, and before it can be claimed that they may do so in any way by legislation, it must be shown that the surrender which they have made to a common government to regulate commerce for the benefit of all of them-, has been done in terms which necessarily imply that the same power may be used by them separately, or that the power in Congress to regulate commerce has been modified by some other clause in the Constitution. No such modifying clause exists. . The terms used do not, in their ordinary import, admit of any exception from the entireness of the power in Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. The exercise of any such power of regulation by the States, or any one or more of them, would conflict with the constitutional authority of; the United States to regulate commerce by legislation and by treaty, and would measurably replace the States in their commercial attitude to each other as they stood under the Articles of Confederation, and not as they meant to be when “ we, the people of the United States,” in their separate sovereignties, as they existed under the Articles of Confederation, superseded the latter by their ratification of “the Constitution for the United States of America.”
In what I have said concerning commercial regulations under the treaty-making power, I do not mean to be understood as saying that by treaty all regulation of commerce can be made, independently of legislation by Congress. That question I do not enter into, here, for in such- cases as are now before the court I have no- right to do so. It has only been alluded to by me to prevent any such inference from being made.
Apply the foregoing reasoning to the acts of Massachusetts and New York, and whatever may be the motive for such enactments or their legislative denomination, if they practically operate as regulations of commerce, or as restraints upon navi-' gation, they are unconstitutional. When they are considered in connection with the existing legislation of Congress in respect to trade and navigation, and with treaty stipulations, they are certainly found. to be in conflict with the supreme law of the land.
But those acts conflict also with other clauses in the Constitution relating to commerce and navigation; also, with that clause which declares that duties, imposts, and excises shall be uniform throughout the United States. Not in respect to excises, for those being taxes upon the consumption or retail sale *420 of commodities, the States have a power to lay them, as well as Congress. Not so, however, as to duties and impost;' f the first, in its ordinary taxing sense, being .taxes or customs upon merchandise ; and an impost being also, in its restrained sense, a duty upon imported goods, but also, in its more enlarged meaning, any tax or imposition upon persons. Notwithstanding what may have otherwise been said, I was brought to the conclusion, in my consideration of the taxing power of Congress before these cases were before us4 that there was no substantial reason for supposing it was used by the framers of the Constitution exclusively in its more confined sense.
But I return to those clauses with which I have said the acts in question conflict. It will be conceded by all, that the fifth clause of the ninth section of the first article of the Constitution, declaring that “ no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another,” was intended to establish among them a perfect equality in commerce and navigation. That all should be alike, in respect to commerce and navigation, is an enjoined constitutional equality, which can neither be -interrupted by Congress nor by the States. When Congress enacts regulations of commerce or revenue, it does so for the United States, and the equality exists. When a State passes a law in any way acting upon commerce, or one of revenue, it can only do so for itself 5and the equality is destroyed. In. such a case the Constitutidh would be violated, both in spirit and in letter.
Again, it is declared in the first clause of the eighth section of the first article of the Constitution, that all duties, imposts, and excises shall be uniform throughout the United States; that is, first, that when Congress lays duties, imposts, or excises, they shall be uniform; and secondly, that if, in the exercise of the taxing power, Congress shall not lay duties or imposts upon persons and particular things imported, the States shall not destroy the uniformity, in the absence of regulation, by taxing either. Things imported, it is admitted, the States cannot tax, whether Congress has made them dutiable articles or free goods; but persons, it is said, they can, because a State’s right to tax is only restrained in respect to imports and exports,, and, as a person is not an import, a tax or duty may be laid dpop him as the condition of his admission into the State.
. But this is not a correct or full view of the point. A State’s right to fax may only be limited to the extent mentioned ; but that does not give the State the right to tax a foreigner or person for coming into one of the States of the United States. That would be a tax or revenue act, in the nature óf a regulation of commerce, acting upon navigation. It is not a dispn- *421 table point, that, under the power given to Congress to layjand collect taxes, duties, imposts, and excises, it may, in the exercise of its power to regulate commerce, tax persons as well as things, as the condition.- of their admission into the United States. To lay and collect taxes, duties, and imposts gives to Congress a plenary power overall .persons and things for taxation, except exports. Such is the received meaning of the word taxes in its most extended sense, and always so when it is not used in contradistinction to terms of taxation, having a limited meaning as to the objects to which, by usage, the terms apply. It is in- the Constitution used in both senses. -In its extended sense, when it is said that Congress may lay and collect taxes; and in a more confined sense, in contradistinction to duties, imposts, and excises.
The power, then, tq tax, and the power to regulate commerce, give to Congress the right to tax persons who may come into the United States, as a regulation of commerce and navigation. I have already mentioned, among the restraints which nations may impose upon the liberty or freedom of commerce, those which may be put upon foreigners coming into or residing within their territories. This right exists to its fullest extent, as a portion of the commercial rights of nations, .when not limited by treaties.
The power to regulate commerce with foreign nations and: among the several States having been given to Congress, Congress may, but the States cannot, tax persons for coming into the United States.
It is urged, however, in reply to what has just been said, that, as the power to regulate commerce and the right to levy taxes are distinct and substantive powers, the first cannot be used to limit the right of the States to tax, beyond the prohibition upon them not to tax exports or imports. The proposition is rightly stated, but what is gained in these cases from it?. Nothing. The sums directed to be paid by .or for passengers are said to be taxes which the States have a right to impose, in-virtue of their police powers, either to prevent the evils of pauperism or to protect, their inhabitants from apprehended disease.-. But the question in these cases is, not whether the States may or may not tax, but whether they can levy a tax upon passengers coming into the United - States under the authority and sanction of the laws of Congress and treaty stipulations.
The right in a nation or state occurs — not in all cases, for there are international exceptions — upon all persqps and things when they come or are brought, within the territory of a state. Not, however, because the person or thing is within the territory, but because they are under the sovereignty or politica' *422 jurisdiction of the state. If not within the. latter, the right to tax does not arise until that event occurs. States may have territorial jurisdiction for most of the purposes of sovereignty, without political jurisdiction for some of them.
The distinction is not mine. It has been long since made •by jurists and writers upon national law, because the history of nations, from an early antiquity until now, shows such relations between them.' The framers of the Constitution acted upon it throughout, in all the sovereign powers which they proposed that the States should yield to the United States. Martens properly says, that, to have a just idea of the states of which Europe is composed, we must distinguish those which are absolutely sovereign from those which are but demi-sovereign.. The states of the German empire, for instance, and the Italian princes who acknowledge their submission to the empire, — and the German states, in their present Diet for great national purposes, with a vicar at its head, overtopping in might and majesty, but with regulated power, all before who have been emperors of Germany. I do not mean to say that the States of this Union are demi-sovereign to the general government in the sense in which some of the nations in Europe are to other nations ; but that such connection between those nations furnishes the proof of the distinction between territorial sovereignty and political sovereignty. The sovereignty of these States and that of the United States, in all constitutional particulars, have a different origin. But I do mean to say, that the distinction between territorial and political jurisdiction arises, whether the association be voluntary between states, or otherwise. Whenever one power has an exterritorial right over the territory or sovereignty of another power, it is called by writers “ a partial right of sovereignty.” Is not that exactly the case between the United States, as a nation, and the States ? Do not the constitutional. powers of the United-States, act upon the territory, as well as upon the sovereignty, of the States, to the extent of what was their sovereignty before, they yielded it to the United States? Can any one of the sovereign powers of the United States be carried out by legislation, without acting upon the territory and sovereignty of the States ? This being so, Congress may say, and does say, whence a voyage may begin to the United States, and where it may end in a State of the United States. Though in its transit it enters the territory of a- State, the political' jurisdiction of the State cannot interfere with it by taxation in any way until the voyage has. ended; not until the persons who may be brought as passengers have been landed, or the goods which may have been entered as merchandise have passed from the hands of the importer, or have been *423 made by himself a portion of the mass of the general property of' the State. It is upon this distinction between territorial and'political jurisdiction that the case of Brown v. Maryland rests. Without it, it has no other foundation, although it is not so expressed in the opinion of the court.
In these cases the laws complained of meet the vessels when they have arrived in the harbour, on the way to the port to which they are bound, before the passengers have been landed. And before they are landed they are met by superadded conditions in the shape of a tax, with which it is said they must comply, or which. the captain must pay for them, before they are permitted to land. Certainly it is not within the political jurisdiction of a State, in such circumstances of a voypgé, to tax passengers.
But it is said, notwithstanding, that the tax may be laid in virtue of police power in the States, never surrendered by them to the United States. A proper understanding of the police power of a nation will probably remove the objection from the mindfe of those who made it. What is the supreme police power pf a state ? It is one of the different, means used by sovereignty to accomplish that great object, the good of the state. It is either national or municipal, in the confined application of that word to corporations and cities. ' It was used in the argument invariably in its national sense. In that sense it comprehends the restraint which nations may put upon the liberty of entry and passage of persons into different countries, for the purposes of visitation or commerce.
The first restraint that nations reserve to themselves is the right to be informed of the name and quality of every foreigner that arrives. That, and no more than that, was Miln’s case. (11 Peters.) Nations have a right to keep at a distance all suspected persons; to forbid the entry of foreigners or foreign merchandise of a certain description, as circumstances may require. In' a word, it extends to every person and every thing in the territory; and foreigners are subject to it, as well as subjects to the state, except only ministers and other diplomatic functionaries ; and they are bound to observe municipal police, though not liable to its penalties.
“The care of hindering what might trouble the internal tranquillity and security of the state is the basis of the police, and authorizes the sovereign to make laws and establish institutions for that purpose, and as every foreigner living in the state ought to concur in promoting the object, even those who enjoy the right exterritorially (such as sovereigns and ministers) cannot dispense with observing the laws of police, although in cage of transgression they cannot be punished like native or temporary subjects of the state.”
*424 Police powers, then, and sovereign powers are the same, the former being considered so many particular rights under that name or word collectively placed in the hands of the sovereign. Certainly the States of this Union have not retained them to the extent of the preceding enumeration. How much of it have the States retained ? I answer, unhesitatingly,, all necessary to theit internal government. Generally! all not delegated by them in the Articles of Confederation to the United States of America; all not yielded by them under the Constitution of the United States. Among them, qualified rights to protect their inhabitants by quarantine from disease ; imperfect and qualified, because the commercial power which Congress has is necessarily connected with quarantine. And Congress may, by adoption, presently and for the future, provide for the observance of such State laws, making such alterations as the interests and conveniences of commerce and navigation may require, always keeping in mind that the great object of quarantine shall be secured.
Such has been the interpretation of the rights of the States to quarantine, and of that of Congress over it, from the beginning of the Federal government.' Under it the States and the United States, both having measurably concurrent rights of legislation in the matter, have reposed quietly and without any harm to either, until the acts now in question caused this controversy. The act of February 25th, 1799, (1 Stat. at Large, 619,) will show this.
By that act, collectors, revenue-officers, masters and crews of revenue-cutters, and military officers in command of forts upon the coast, are required to aid in the execution of the State’s quarantine laws. But then, and it may be observed particularly in reference to the acts of Massachusetts and New York now in. question, the law provides that nothing in the act “ shall enable a State to collect a duty of tonnage or impost without the consent of Congress ” ; that no part of the cargo of any vessel shall in any case be taken out, otherwise than as by law is allowed, or according to the regulations thereinafter established; thus showing that the State’s quarantine power over the cargo for the purpose of purifying it or the vessel has been taken away. By the second section of the same act, the power of the States in respect to warehouses and other, buildings for the purification of the cargo is also taken away, and exclusively assumed by the United States. And by the third section, in order that the States may be subjected to as little expense as possible, and that the safety of the public revenue may not be lessened, it is provided that the United States, under the orders of the President of the United States, shall purchase or erect *425 suitable warehouses, with wharves and .inclosures for goods, and merchandise taken from vessels subject to quarantine, or other restraint, pursuant to the health laws of any State.. And in regard to the word imposts, in the first section of the act, I may here remark, though I have heretofore given its meaning, that it means in the act,' as well as it does in the Constitution, personal imposts upon á foreigner enjoying the protection of a State, or it may be a condition of his admission (Martens, p. 97), as well as any tax or duty upon goods ; and Martens, as well as all other jurists and writers upon international law, uses the word in the sense I have said it has, also, as “ imposts on real estates and duties on the entry and- consumption of merchandises.” (pp. 97, 98.)
But, further, by the police power in the States they have reserved the right to be informed of the name and quality of every foreigner that arrives in the State. This, and no more than this, was Miln’s case, in 11 Peters. But after they have been landed, as is said uRMiln’s case. And it was surprising to me, in the argument of these cases, that that admission in Miln’s case was overlooked by those who spoke in favor of the constitutionality of the laws of Massachusetts and New York; for the right of New. York to á list of passengers, notwithstanding the passenger laws of the United States, is put upon the ground that those laws “ aifect passengers whilst on their voyage, and until they shall have landed.” And “after that, and when they shall have ceased to have any connection with the ship, and when, therefore, they shall have ceased to be passengers, the acts of Congress applying to them as such, and only professing to legislate in relation to them as such, have then performed their office, and can with no propriety of language be said to come in conflict with the law of a State, whose operation only begins where that of the laws of Congress ends.” That is, that the passenger acts, as my brother Catron has shown in his opinion, extend to his protection, from all State interference, by taxation or otherwise, from the time of his embarcatioñ abroad: until he is landed in the port of the United States for which- the vessel sailed.
The States have also reserved the police right to turn off from their territories' paupers, vagabonds, and fugitives from justice. But they have not reserved the use of taxation universally as the means to accomplish that object, as they had it before they became the United States. Having surrendered to the United States the sovereign police power over commerce, to be exercised by Congress or the treaty-making power, it is necessarily a part of the power of the United States to determine who shall .come to and reside in the United States for *426 the purposes of trade, independently of every other condition of admittance which the States may attempt to impose upon such persons. When it is done in either way, the United States, of course, subject the foreigner to the- laws of the United States, and canhot exempt him from the internal power of police of the States in any particular in which it is not constitutionally in conflict with the laws of the United States. And in this sense it is that, in treaties providing for such mutual admission of foreigners between nations, it is universally said, “ hut subject always to the laws and statutes of the two countries respectively ” ; but certainly not to such of the laws of a State as would exclude the foreigner, or which add another condition to his admission into the United States.
And, .further, I may here remark that this right of taxation claimed for the States upon foreign passengers is inconsistent with the naturalization clause in the Constitution, and the laws of Congress regulating it. If a State can, by taxation or otherwise, direct upon what terms foreigners may come into it, it may defeat the whole and long-cherishéd policy of this country and of the Constitution in respect to immigrants coming to the United States.
But I have said the States have the right to turn off paupers, vagabonds, and fugitives from justice, and the States where slaves are have a constitutional right to exclude all such as are, from a common ancestry and country, of the same class of men. And when Congress shall legislate, — if it be not disrespectful for one who is a member of the judiciary to suppose so absurd a thing of another department of the government, — to make paupers, vagabonds, suspected persons, and' fugitives from justice subjects of admission into the United States, I do not doubt it will be found and declared, should it ever become a matter for judicial decision, that such persons are not within the regulating power which the United States have over commerce. Paupers, vagabonds, and fugitives never have been subjects of rightful national intercourse, or of commercial regulations, except in the tránsportation óf them to distant colonies to get rid of them, or for punishment as convicts. They -have no rights of national intercourse; no one has a right to transport them, without authority of law, from \yhere they are to any other place, and their only rights where they may be are such as the law gives to all men who have not altogether forfeited its protection.
The States may meet such persons upon* their arrival in port, and may put them under all proper restraints. They may prevent them from entering their territories, may carry them out or drive them off. But can such a police power be right *427 fully exercised over those who are not paupers, vagabonds, or fugitives from justice ? The . international right of visitation forbids it. The freedom ox liberty of commerce allowed by all European nations to the inhabitants of. other nations does not permit it; and the constitutional obligations of the States of this Unión to the United States, in respect to commerce and navigation and naturalization, have qualified -<the original discretion of the States as to who shall come and live in the United States. Of the extent of those qualifications, or what may be the rights of the United States and the States individually in that regard, I shall not speak now.
But it was assumed that a State has unlimited discretion, in virtue of its unsurrendered police power, to determine what persons shall reside in it. Then it was said to follow, that the State can remove all persons who are thought dangerous to its welfare j and to this right to remove, it was said, the right to determine who shall enter the State is an inseparable incident.
That erroneous proposition of the State’s discretion in this matter has led to all the more mistaken inferences made from it. The error arose from its having been overlooked that a part of the supreme police power of a nation is identical, as I have shown it to be,, with its sovereignty over commerce. Or, more properly speaking, the regulation of commerce is one of those particular rights collectively placed in the hands of the. sovereign for the good of the State. Until it is shown that the police power in one’of its particulars is not what it has just been said to be, the discretion óf a State of this Union to determine what persons may come to and reside in it, and what persons may be removed from it, remains unproved: It cannot be proved, and the laws of Massachusetts and New York derive no support from police power in favor of their constitutionality.
Some reliance in the argument was put upon the cases of Holmes v. Jennison, 14 Pet. 540, Groves v. Slaughter, 15 Pet. 449, and Prigg v. Commonwealth of Pennsylvania, 16 Pet. 539, to maintain the discretion of a State to say who shall come to and live in it. Why either case should have been cited for such a purpose I was at a loss to know, and have been more so from a subsequent examination of each of them.
A'll that is decided in the case of Holmes v. Jennison is, that the States of this Union have no constitutional power to give up fugitives from justice to the authorities of a nation from which they have fled. That it is not an international obligation to do so, and that all authority to make treaties for such a purpose is in the United States. *428 The point ruled in the case of Groves v. Slaughter is, that the State of Mississippi could constitutionally prohibit negroes from being brought into that State for sale as merchandise, but that the provision in her constitution required legislation before it acted upon the subject-matter.
The case of Prigg v. The Commonwealth of Pennsylvania is inapplicable to the cases before us, except in tjie support which it gives to the construction of the police power, as "stated in this opinion, —• that it is applicable to idlers, vagabonds, paupers, and, I may add, fugitives from justice, and suspecte'd persons.-
Miln’s case I will speak of hereafter, and now only say that no point was ruled in it, either in respect to commerce or the right of the State to a list of passengers who may come-by-sea into New York after they are landed, which gives any countenance or support to the laws now in question.
The fear expressed, that if the States have not the discretion to determine who may come and live in them, the United States may introduce into the Southern States emancipated negroes from the West Indies and elsewhere, has no foundation. It is not an allowable inference from the denial of that position, or the assertion of the reverse of-it.
All the political sovereignty of the United States, within the States, must be exercised according to the subject-matter upon which it may be brought to bear, and according to what was the actual condition of the States in their domestic insti.tutions when the Constitution was formed, until a State shall please to alter them. The Constitution was formed by States in which slavery existed, and was not -likely to be relinquished, and States in which slavery had been, but was abolished, or for the prospective abolition of which provision had been made by law. The undisturbed continuance of that difference between the States at that time, unless as it might be changed by a State itself, was the recognized condition in the Constitution for the national Union. It has that, and can have no other, foundation.
Is it not acknowledged by all that the ninth section of the first article of the Constitution is a recognition of that fact? There are other clauses in the Constitution equally, and some of them more, expressive of it.
That is a very narrow view of the Constitution which supposes that any political sovereign right given by it can be exercised, or" was meant to be used, by the United States in such a way as to dissolve, or even disquiet, the fundamental organization of either of the States. The Constitution is to be interpreted by what was the condition of the parties to it when it *429 was formed, by their object and purpose in forming it, and by the actual recognition in it of the dissimilar institutions of the States. The exercise of constitutional power by the United States, or the consequences of its exercise, are not to be concluded by the summary logic of ifs and syllogisms.
It will be found, too, should this matter of introducing free negroes into the Southern States ever become the subject of judicial inquiry, that they haye a guard against it in the Constitution, making it altogether unnecessary for them to resort to the casus gentis extraordinarias, the casus extremes neces-sitatis of nations, for their protection and preservation. They may rely upon the Constitution, and the correct interpretation of it, without seeking to be relieved from any of their obligations under it, or having recourse to the jus necessitatis for self-preservation. .
I have purposely refrained from repeating any thing that has been said in the opinions of my learned brothers, with whom I am united in pronouncing the laws of Massachusetts and New York in question unconstitutional. What they have said for themselves they have. also said for me, and I do not believe that I have said any thing in this opinion which is not sanctioned by them.
Having- said all that I mean to say directly concerning the cases before us, I will now do what I have long wished to do, but for which a proper opportunity has -not been presented before. It is to make a narrative in respect to the case of The City of New York v. Miln, reported in 11 Peters, 102, that hereafter the profession may know definitely what was and what was not decided in that case by this court. It has been much relied upon in the cases before us for what was not decided by the court.
The opinion given by Mr. Justice Barbour in that case, though reported as the opinion of the court, had not at any time the concurrence of a majority of its members, except in this particular, — that so much of the act of New York as required the captain-.of a vessel to report his passengers as the act directs it to be done was a police regulation, and therefore was not unconstitutional or a violation of the power of Congress to regulate commerce. In that particular, and in that only, and, as it is said in the conclusion of the opinion, “ that so much of the section of the act of the legislature of New York as applies 'to the breaches assigned in the declaration does not assume to regulate commerce between the port of New York and foreign ports, and that so much of said act is constitutional.” (11 Peters, 143.) But as to all besides in that opinion as to the constitutional power of Congress to regulate commerce, — except *430 the disclaimer in the 132d page, that it was not intended to enter into any examination of the question, whether the power to regulate commerce be or be not exclusive of the States, — and especially the declaration that persons were not the subjects of commerce, the opinion had not the assent of a majority of the members of this court, nor even that of a majority of the judges who concurred in the judgment. The report of the case in Peters, and the opinion of Mr. Justice Baldwin, accidentally excluded from the report, without the slightest fault iii the then reporter of the court or in the clerk, but which we have in full in Baldwin’s Yiew of the Constitution, published in the same year, fully sustain what I have just said. I mention nothing from memory, and stand upon the record for all that I have said, or shall say, concerning the case.
The court then consisted of seven justices, including the chief justice; all of us were present at the argument; all of us were in consultation upon the case; all of us heard the opinions read, which were written by Messrs. Justices Thompson and Barbour, in the case; and all of us, except Mr. Justice Baldwin, Were present in this room when Mr. Justice Barbour read the , opinion which appears in Peters as the opinion of the court.
The case had been argued by counsel on both sides, as if the whole of the act of New York were involved in the certificate of the division of opinion by which it was brought before this court. The point certified was in these words: — “ That the act of the legislature of New York,' mentioned in the plaintiffs declaration, assumes to regulate trade and commerce between the ports of New York and foreign ports, and is unconstitutional and void.”
' In the consultation of the judges upon the case, as the report shows, the first point considered by us was one of jurisdiction. That is, that the point certified was a submission of the whole case, which is not permitted, and was not a specific point arising on the trial of the cause. The court thought it was the latter, principally for the reason given by Mr. Justice Thompson, as it appears in his opinion. That reason was, that the question arose upon a general demurrer to the declaration, and that the certificate under which the cause was sent- to this court contains the pleadings upon which the question arose, which show that no part of the act was drawn in question, except that which relates to the neglect of the master to report to the mayor or recorder an account of his passengers, according to the requisitions of the act. In the discussion of the case, however, by the judges, the nature and exclusiveness of the power in Congress to regulate commerce was much considered. There was a divided mind among us about it. Pour of the *431 court being of the opinion, that, according to the Constitution and the decisions of this court in Gibbons v. Ogden and in Brown v. Maryland, the power in Congress to regulate commerce was exclusive. Three of them thought otherwise. And to this state of the court is owing the disclaimer in the opinion, already mentioned by me, that the exclusiveness of the power to regulate commerce was not in the case a point for examination.
But there was another point of difference among the judges in respect to what was commerce under the constitutional grant to Congress, particularly whether it did not include an intercourse of persons and passengers in vessels. Two of the court — the report of the case shows it — thought, in the language of the opinion, that “persons are not subjects of commerce.” Mr. Justice Thompson declined giving any opinion on that point, and repeated it in the opinion published by him. Four of the justices, including Mr. Justice Baldwin, thought that commerce did comprehend the intercourse of persons or passengers. For this statement I refer to the opinion of Mr. Justice Thompson, to the dissenting opinion of Mr. Justice Story, to the opinion of Mr. Justice Baldwin, to the constantly avowed opinion of Mr. Justice McLean, and to what has always been known by the justices of this court to be my own opinion upon this point.
In this state of the opinions of the court, Mr. Justice Thompson was designated to write an opinion, —- that the law in question was a police regulation, and not unconstitutional. He did so, and read to the court the opinion, which he afterwards published. It was objected to by a majority of the court, on account of some expressions in it concerning the power of Congress to regulate commerce, and as our differences could not be reconciled, Mr. Justice Thompson said he would read it as his own.
Then Mr. Justice Barbour was asked to write an opinion for the majority of the court. He did so, and read that which is printed as such, in our last conference of that term, the night before the adjournment of the court. The next day it was read in court, all of the judges being present when it was read, except Mr. Justice Baldwin. In the course of that morning’s sitting, or immediately after it, Mr. Justice Baldwin, having examined the opinion, objected to its being considered the opinion of the court, on account of what was said in it concerning the power of Congress to regulate commerce, and what was .commerce. He sought Mr. Justice Barbour, with the view of having it erased from the opinion, declaring, as all the rest of us knew, that his objection to the opinion of *432 Mr. Justice Thompson was on account of what it contained upon the- subject of commerce; that his objection to the reasoning upon the same matter in Mr. Justice Barbour’s opinion was stronger, and that he had only assented that an opinion for the' court should be written, on the understanding that so much of the act of New York as was in issue by the pleadings should be treated as a regulation, not of commerce,' but police. Without his concurrence, no opinion could' have been written. Unfortunately, Mr. Justice Barbour had left the court-room immediately after reading his opinion, already prepared to leave Washington in a steamer which was in waiting for him. Mr. Justice Baldwin- did not see him. The court was adjourned. Then there was no authority to make any alteration in what had been read-as the opinion of the court. Mr. Justice Baldwin wished it, but, under the circumstances of preparation which each judge was making for his departure from Washington, nothing was done, and Mr. Justice Baldwin determined to neutralize what he objected to in the opinion by publishing in the reports his own opinion of the case. That was not done, but he did so contemporarily with' the publication of the reports, in his View of the Constitution. There it is, to' speak for itself, and it shows, as I have said, that so much of the opinion in the case of New York v. Miln as related- to commerce did not have the assent of Mr. Justice Baldwin, and. therefore net the assent of a majority of the court.
How, then, did the case stand ? Mr. Justice Thompson gave his own opinion, agreeing with that of Mr. Justice Barbour, that-so much of the section of the act of the legislature of New York as applies to the breaches assigned in the declaration does not assume to regulate commerce between the port of New York and foreign ports, and that so much of said section is constitutional, but giving his own views of the commercial question as it stood in relation to the case.. The attitudé of Mr. Justice Baldwin with respect to the opinion has just been told.' Mr. Justice Story dissented from every part of the opinion, on the ground that the section of the act in controversy was a regulation of commerce, which a State could not constitutionally pass. Mr. Justice McLean is here to speak for himself, and he did then speak as he has done to-day in these cases concerning the power in Congress to regulate commerce being exclusive, and held that persons are the subjects of commerce as well as goods, contrary to what is said in the opinion (136th page), that persons are not. I certainly objected to the opinion then, for the same reasons as Mr. Justice McLean. Thus there were left of the seven judges but two, the Chief Justice and Mr. Justice Barbour, in favor of the opinion as a whole.
*433 I have made this narrative and explanation, under a solemn conviction of judicial duty, to disabuse the public mind from wrong impressions of what this court did decide in that case; and particularly from the misapprehension that it was ever intended by this court, in the case of New York v. Miln, to reverse or modify, in any way or in the slightest particular, what had been the judgments and opinions -expressed by this court in the cases of Gibbons v. Ogden and Brown v. Maryland. And I am happy in being able to think, notwithstanding the differing opinions which have been expressed concerning what was decided in those cases, that they are likely, to stand without reversal.
The chief justice, the morning after I had read the foregoing statement in the case of New York v. Miln, made another to counteract it, in which he says his recollections differ from mine in several particulars. I do not complain of it in any way. But it enable's me to confirm my own in some degree froin his, and in every other particular in which it does not give such assistance, the facts related by me are indisputable, being all in the report of the case in Peters, from which I took them. They are in exact coincidence, too, with my own recollections.
The only fact in my statement not altogether; but in part, taken from the record, is Mr. Justice Baldwin’s discontent with the opinion written by Mr. Justice Barbour, and his wish that it might not as a whole be published in our volume of reports as the opinion of the court. The chief justice admits that Mr. Justice Baldwin did apply to him after the adjournment of the court, and before they left Washington, for that purpose. Now if, by mistake or oversight, a judge shall fall into an admission, which more care afterwards enables him to recall- and correct before the judgment has been published, but after it has been read, whatever may be .the operation of the judgment, does it follow that the argument in the opinion, -in which the judgment is given continues to be the law of the court? And if the same judge, after more careful and'matured thought, publishes contemporarily his opinion, differing from the dictum which had escaped his- notice, will that make it law ? Is it. not plain that it is a case of mistake, which cannot make the law ? And if his cooperation is essential' to the validity of the original opinion, from those who may advocate it being thrown into the minority by his withdrawal, and his declaration that he never meant to cooperate in it in the'particular objected to, can it be said that it. ever was-the law of the court ? Is it at all- an uncommon thing in the English and American law reports, that a case is published as law which is *434 deemed afterwards not to be so, on account of error in its publication, froto its not having been really the opinion of the court when it was published ? Mistake in all ca&es restores things to the correct condition in which they were before the mistake was made, except where the policy of the law has determined that it shall be otherwise. A single mistaken' and misstated case is not within that policy. Long acquiescence, or repeated judicial decisions, may be,, and then only because the interests of society have been accommodated to the error.
But the chief justice says that he has the strongest reason to suppose that Mr. Justice Baldwin became satisfied, because, in his opinión in the case of Groves v. Slaughter, he quotes the case of New York v. Miln with approbation, whep speaking in that case of the difference between commercial and police powers.
I certainly cannot object to the opinion of Mr. Justice Baldwin in Groves v. Slaughter being a test between the chief justice and myself in this matter; for Mr. Justice Baldwin’s opinion in that .case, is the strongest proof that could have been given four years afterwards, by himself, that he never was reconciled to the opinion of Mr. Justice Barbour in Miln’s case as a whole. For instance, in that opinion he does not leave the exclusive power of Congress to regulate commerce to the', disclaimer in Miln’s case, that it was not the intention of the judges to decide that point in that case. • He says, — “ That the power of Congress to regulate commerce among the States is exclusive of any interference by the States has been, in my opinion, conclusively settled by the solemn opinions of this court in Gibbons v. Ogden, 9 Wheat. 186-222; and in Brown v. Maryland, 12 Wheat. 438-446. If these decisions are not to be taken as. the established construction of this clause of the Constitution, I know of none which are not yet open to doubt, nor can there be any adjudications of this court which must be considered as authoritative upon any question, if these are not to be so on this.” And the learned judge goes on to say, — “Cases may indeed arise, wherein there may be found difficulty in discriminating between regulations of commerce among the several States and the regulation of the internal police of a State, but the subject-matter of such regulations of either description will lead to the true line which separates them, when they are examined with a disposition to .avoid a collision between the powers granted to the Federal government by the people of the. several States and those which they reserved exclusively to themselves. Commerce among the States, as defined by this court, is trade, traffic, intercourse, and- dealing in articles of commerce between States by its citi *435 zens or others, and carried on in more than one State. Police relates only to the internal concerns of one State; and commerce within it is purely a matter of internal regulation, when confined to those articles which have become so distributed as to form items in the common mass of property. It follows, that any regulation which affects the commercial intercourse between any two or more States, referring solely thereto, is within the powers “granted exclusively to, Congress, and that those regulations which affect only the commerce carried on within one State, or which refer only to subjects of internal police, are within the powers reserved.” And then it is that the sentence follows cited by the chief justice to show that he had reason to suppose that Mr. Justice Baldwin had become satisfied. The citation made- by me from his opinion shows what his opinion was in respect to the power of Congress to regulaté commerce, confirming what I have said in my statement, that four of us *were of the same opinion when that point was touched upon in the case of. Miln, and that Mr. Justice Baldwin refused to sanction what was said by Mr. Justice Thompson in respect to it in the opinion written by him for the court in Miln’s case. And that he was not satisfied as to that sentence of Mr. Justice Barbour’s opinion in which it is said that persons are not the subjects of commerce, is manifest from that part of his opinion in Groves v. Slaughter in which he says that commerce is “ trade, traffic, intercourse ” ; — intercourse, in the’ sense of commerce, meaning, as it always does, “connection by reciprocal dealings between persons and nations.” But, further, the chief justice says that Mr. Justice Baldwin called upon him and said there was a sentence or paragraph in the opinion with which he was dissatisfied, and wished altered, thus confirming all that I have said in respect to the case in what is in it concerning persons not being the subjects of commerce, that being the only declaration in the opinion relating to commerce, it having been previously declared that the exclusiveness of the regulation of commerce in Congress was not to be decided.. All that was meant to be decided in Miln’s case was, that the regulation stated in the certificate of division of opinion between the judges in the Circuit Court was not a regulation of commerce, but one of polic'e. In respect to our lamented brother Barbour not knowing the dissatisfaction of our brother Baldwin and other members of the court with the opinion, I know that he did kriow-it. In regard to the chief justice’s declaration, that he had never heard any further dissatisfaction expressed with the opinion by Mr. Justice Baldwin, and never at any time, until this case came before us, heard any from any other member of the court *436 who had assented to or acquiesced in the opinioir; while, of •course, that must- be taken to be so, as far as the chief justice is concerned, I must say that I have never, in any instance, heard the case of Miln cited for the purpose of showing that persons are not within the regulating- power of Congress over-commerce, without at once saying to the counsel that that point had not been decided in that case, i have repeatedly done so in open court, and, as I supposed, was heard by every member of it. I have only said,' in reply to the chief justice’s statement, what was necessary to show that it was not decided in Miln’s case, by this court, that persons are not within the power of Congress to regulate commerce.
Indeed, it would be most' extraordinary if the case of Gibbons v. Ogden could be considered as having been reversed by a single sentence in the opinion of New York v. Miln; upon a point, too, not in any way involved in ther’certificate of the division of opinion by which that case was brought to this court. The sentence is, that “ they [persons] are not the subjects of commerce ; and,- not being imported goods, cannot fall within a train of reasoning founded upon the construction of a power given to Congress to 'regulate commerce, and the prohibition to the States from imposing a duty on imported goods.”
In the case of Gibbons v. Ogden the court said, — “ Commerce is traffic ; but it is something more. It is intercourse. It describes the commercial intercourse between nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse.”
Again : — “ These words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other to which this power does not extend.” “ In regulating commerce with foreign nations; the power of Cón-gress does not stop at the jurisdictional lines of the several States. It would be a very useless power if it could not pass those lines.” “ If .Congress has the power to regulate it, that power must be exercised whenever the subject exists. If it exists within the States, if a foreign voyage may commence or terminate at a.port within a State, then the power of Congress may be exercised within a State.” “ The power of Congress comprehends navigation within the limits of every State in the Union, so far as that navigation may be connected with commerce with foreign nations, or among the several States.” “ It is the power to regulate ; that is, to prescribe the rule by. which commerce is governed.” “ Vessels have, always been employed to a greater or less extent in the transportation of *437 passengers, and have never been supposed, on that account, withdrawn from the control or protection of Congress. Packets which ply along the coast, as well as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it never has been suspected that the general laws of navigation did not apply to them. A coasting-vessel employed in the transportation of passengers is as much a portion of the American-marine as one employed in the transportation of cargo.”
In my opinion, the case of Gibbons v. Ogden rules the cases before uá.' If there were no other reasons, with such an authority to direct my course, I could not refrain from saying that the acts of Massachusetts and New York, so far as they are in question, are unconstitutional and void.
The case of Gibbons v. Ogden, in the extent and variety of learning, and in the acuteness of distinction with which it was argued by counsel, is not surpassed by any other case in the reports of courts. In the consideration given to it by the court, there, are proofs of judicial ability, and of close and precise discrimination of most difficult points, equal to any other judgment on record. To my mind, every proposition in it has a definite and unmistakable meaning. Commentaries cannot cover them up or make them doubtful.
The case will always be a high and honorable proof of the eminence of the American bar of that day, and of the talents and distinguished ability of the judges who were then in.the places which we now occupy,
There were giants in those days, and I hope I may be allowed to say, without more than judicial impressiveness' of manner or of words, that I rejoice that the structure raised by them for the defenc’e of the Constitution has not this day been weakened by their successors.
Mr. Justice CATRON.
Smith v. Turner.
The first question arising in this controversy is, whether the legislation of New York, giving rise to the suit, is a regulation of commerce; and this must be ascertained, in a great degree, from, a due consideration of the State laws regulating the port of the city of New York in respect to navigation and intercourse. They are embodied in a system running through various titles in the Revised Statutes. The sections on which the. action before us is founded will be found in Yol. I. pp. 445, 446. Title fourth purports to treat of the marine hospital and its funds, then, in 1829, erected on Staten Island, under the *438 intendence of a health-officer, who is to be a physician, and certain commissioners of health. By section seventh, it is provided, that “ the health-commissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, in his name of office, the following sums from the master of every vessel that shall arrive in the port of New York, viz.: — 1. From the master of every vessel from a foreign port, for himself and every cabin passenger, one dollar and ■ fifty cents; and for each steerage passenger, mate, sailor, or marine, one dollar. 2. From the master of each coasting-vessel, for each person on board, twenty-five cents; but no coasting-vessel from the States of New Jersey, Corn necticut, and Rhode Island shall pay for more than one voyage in each month, computing from the first voyage in each year.”
“ Sec. 8. The moneys so received shall be denominated ‘ hospital moneys,’ and shall be appropriated to the use of the marine hospital, deducting a commission to the health-commissioner of two and one half per cent, for collection.”
Turner, the heal ,h-commissi oner, sued Smith, as master of the ship Henry Bliss, a British vessel, coming from Liverpool, in England, for the amount of money claimed as due from the defendant under the above provisions, because he brought in •two hundred and ninety-five steerage passengers, who were British subjects, immigrating into the United States, and intending to become inhabitants thereof.
By section ninth, the master paying the hospital money may recover from each person for whom it was paid the sum paid-on his account, in case of a foreign vessel; and by section tenth, the master of a coasting-vessel shall pay the tax in twenty-four hours after the vessel arrives in port, under the penalty of one hundred dollars.
The eleventh section directs the health-commissioners annually to account to the Comptroller of the. State for the moneys received by them by means of the tax for the use of the marine hospital, and if such moneys shall in any one year exceed the •sum necessary to defray the expenses of their trust, including salaries, &c., they shall pay over such surplus to the Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of that society.
By the act of April 25th, 1840, the Comptroller of the State, was authorized to draw on the treasurer, annually, for twenty years, a süm not exceeding fifteen thousand dollars in each year, for the benefit of the State hospital in the city, and a sum of eight thousand dollars is there recognized as payable to the Society for the Reformation of Juvenile Delinquents; and the *439 city hospital is bound by'the act to support at least twenty indigent persons from any part of the State. Thus a State hospital is also supported out of the fundi-as well as an institution for young culprits, imposing an annual charge on the fund of twenty-three thousand dollars, having no necessary connection with commerce; and, by the act of 1841, three medical dispensaries are endowed, out of the fund to an amount of four thousand five hundred dollars.
The ship Henry Bliss was -engaged in foreign commerce when she arrived in the port of New York, and when the tax was demanded of Smith, the master, by Turner, the health-commissioner. The baggage of passengers was on board, and alfeo their tools of trade, if they had any, and of course the passengers were -on board,- for the master is sued, in one count, for landing them after the demand. The tax of two hundred and ninety-five dollars was therefore demanded before the' voyage was ended, or the money earned for carrying passengers and their goods. The vessel itself was undoubtedly regulated by our acts of Congress, and also by our treaty with Great Britain of 1815, — the national-character of the vessel being. British. She had full liberty to land, and so the goods on board belonging to trade and coming in for sale stood regulated; and could be landed and entered at the custom-house. And by the same treaty, passengers on board coming to the United States in pursuit of commerce in buying and selling were free to land. The master and crew were of' the ship and navigation, and stood equally regulated with the ship. The property of . passengeis could not be taxed or seized, being expressly and affirmatively protected by the act of 1799. It was an import, ’ and whilst it continued in form of an import, could be landed and transferred by the owners inland. This is the effect of the decision in Brown v. The State of Maryland. As the State power had nothing left to act upon but the person simply, nor any means of collecting the tax from passengers, it was levied on the master, of necessity, in a round sum.
As the ship was regulated, and was free to land all the property on board, the question arises, whether these immigrant passengers were not also regulated, and entitled- by law to ac-. company their goods and to land, exempt from State taxation.
The record states, that “ the two hundred and ninety-five passengers imported in the ship Henry Bliss belonged to Great Britain, and intended to become inhabitants of the United States.”
By the laws of nations, all commerce by personal intercourse is free until restricted; nor has our government at any time proposed to restrain by taxation such immigrants as the record describes.
*440 Our first step towards establishing an independent government was by the Declaration of Independence. By that act it was declared that the British king had endeavoured to prevent the population of the colonies by obstructing the laws for the naturalization of foreigners, and refusing .to pass others to encourage their migration hither, and raising the conditions of new appropriations of lands. During the Confederation, the States passed naturalization laws for themselves, respectively, in which there was great want of uniformity, and therefore the Constitution provided that Congress should have power “ to establish a uniform rule of naturalization.” In execution of this .power, Congress passed an act at its second session, (March 26th, 1790,) providing that any alien, being a free white person, who shall have resided in the United States two years, and in any one State one year, may become a citizen by taking an oath to support the Constitution in a court of record, and such step shall naturalize all the children of such person under twenty-one years of age. In 1795, another act was passed (ch. '20), requiring five years^residence ; and on the 26th of April, 1802, (ch. 28,) the naturalization laws were amended. This act is now in force, with slight alterations. Under these laws have beén ..admitted such numbers, that they and their . descendants constitute a great part of our population. Every department of science, of labor, occupation, and pursuit, is filled up, more, or less, by naturalized citizens and their numerous offspring. From the first day of our separate existence to this time has the policy of drawing hither aliens, to the end of becoming citizens, been a,favorite policy of the United States; it has been cherished by Congress with rare steadiness and' vigor. By this policy our extensive ánd fertile country has been, to a considerable extent, filled up by a respectable population, both' physically and mentally, one that is easily governed and usually of approved patriotism.. We have invited to come to our country from other lands all free white persons, of every grade and of every religious belief, and when here to enjoy our protec-' tion, and at the .end of five years to enjoy all our rights, except that of becoming President of the United States. Pursuant to this.notorious and long, established policy, the two hundred and ninety-five passengers in the Henry Bliss arrived at the port of New York.
Keeping in view the spirit of the Declaration of Independence with respect to the importance of augmenting the population of the United States, and the early laws of naturalization, Congress, at divers subsequent periods, passed laws to facilitate . and encourage more and more the immigration of Europeans into the United States fón the purpose of settlement and residence.
*441 The twenty-third section of the general collection act of the 2d of March, 1799, requires that every master of a vessel arriving • in the United States shall have on board a manifest, in writing, signed by such master, of the goods, wares, and merchandise on board such vessel, “ together with the name- or names of the several passengers on board the said ship or vessel, distinguishing whether cabin or steeragé passengers, or both, with their baggage, specifying the number and description of packages belonging to each respectively.”
The twenty-fifth section of the same act makes it the duty of the master to produce, on. his arrival within four leagues of the coast, such manifest to such officer or officers of the customs as shall first come On board his said ship or vessel; and by the twenty-sixth section, a fine of five hundred dollars is impbsed on the master for. not producing such manifest.
By the thirtieth section of the same act, the master is required, within twenty-four hours after his arrival from a foreign port, to repair to the office of the collector and make report of the arrival of his ship; “and within forty-eight hours after such arrival, shall make a further report in writing to the collector of the district, which repprt shall be in the form, and shall contain all the particulars, required to be inserted in a manifest ” ; and he is required to make oath or solemn affirmation to the truth of such report. But the material section of, that act is the forty-sixth. That section declares, that “the wearing apparel, and other personal baggage, and the tools or implements of a mechanical trade only, of persons who arrive in the United States shall be free of duty.” The same section prescribes a. form of declaration, that the packages contain no goods or merchandise other than the wearing apparel, personal baggage, and tools of trade belonging to the person mak'ing the declaration, or his family. Before the property exempt from duty is allowed' to be landed, a permit to do so must be obtained from the collector of the port, and each owner is bound, to pay a fee for such privileges, for the 'support of the revenue-officers.
It is quite obvious, from these proceedings, that the passengers who were thüs in the contemplation of Congress were, for the most part, immigrants, or persons coming to settle in the United States with their families. The act of the -27th of April, 1816, section second, reenacts, in substance, that part of the forty-sixth section of the act of the 2d of March, 1799, above quoted. . Exemptions and privileges in favor of passengers arriving in the United States are carried still further,' by the provisions of the fourth subdivision of the ninth section of the duty act of the 30th of August, 1842. Among articles *442 declared by that act to be free of duty are “ wearing apparel in actual use, and other personal effects, not merchandise, professional books, instruments, implements and tools of trade, occupation, or employment, of persons arriving in the United States.” This provision is. very broad. It not only exempts from duty tools of mechanical trades, but all instruments and implements of occupation and employment, and also all professional books, without limitation of value or numbers.
A still further enlargement of these privileges and exemptions is contained in the duty act of the 30th of July, 1846; for the eleventh section of that act (schedule 1)¡ in addition to the passengers’ articles made free by the act of 1842, declares, free from duty “household effects, old and in use,.of persons or families from foreign countries, if used abroad by them, and not intended for any other person or persons.”
Now, is it possible to reconcile State laws, laying direct and heavy taxes on every immigrant.passenger and every member of Ms family, with this careful, studied, and ever-increasing security of immigrants against every legal burden or charge of any kind ? Could Congress have done more than it has done, unless it had adopted what would have been justly regarded as a strange act of legislation, the insertion of passengers themselves in the list of free articles ?
The first and one of the principal acts to be performed on bringing ships and, goods from foreign countries into the United States is the production of a manifest; and in such manifest, along with the specifications of the cargo, the names and description of the passengers, with a specification of their packages of property, are to be inserted. Then comes a direct exemption of. all such property from duties. All agree, that, if Congress had included the owners, and declared that immigrants might come into the country free of tax, these State laws would be void; and can any man say, in the face of the legislation of Congress from 1799 to 1846, that the will of Congress is not as clearly manifested as if it had made such a direct declaration ?. It is evident that, by these repeated and well-considered acts of legislation, Congress has covered, and has intended to cover, the whole field of legislation over this braneh of commerce. Certain conditions and restraints it has imposed ; and subject to these only, and acting in the spirit of all our history and all our. policy, it has opened the door widely and invited the subjects of other countries to leave the crowded population of Europe and come to the United States, and seek, here new homes for themselves and their families. We cannot take into consideration what may or may not be the policy adopted or cherished by particular States; some States may *443 be more desirous than others that immigrants from Europe should come and settle themselves within their limits; and in this respect no one State can rightfully claim the power of thwarting by its own authority the established policy of all the States united.
The foregoing conclusions are fortified by the provisions of the act of March 2d, 1819. It provides that not more than two passengers shall be brought or carried to each five tons’ measure of the vessel, under a severe penalty; and if the number exceeds the custom-house measure by twenty persons, the vessel itself shall be forfeited, according to the ninety-first section of the act of 1799. The kind and quantity of provisions are prescribed, as well as the quantity of water, and if the passengers are put on short allowance, a right is given to them to recover at the rate of three dollars, a day to each passenger, and they are allowed to recover the same in the mauner seamen’s wages are recovered, that is, in a summary manner, in a District Court of the United States. The master is also required, when the vessel arrives in the United States, at the same time that he delivers a manifest of his cargo, and if there be none, then wken he makes entry of the vessel, to deliver and report to the collector, by manifest, all the passengers taken on board, the ship at any foreign port or place, designating age, sex, and occupation; the country to which they severally belong, and that of which it is their intention to become inhabitants; which manifest shall be. sworn to as manifests of cargo are, and subject to the same penalties. These regulations apply to foreign vessels as well as to our own, which bring passengers to the. United States.
1. By the legislation of Congress, the passenger is allowed to sue in a court of the United States, and there to appear in per-sondas'a seaman may, and have redress for injuries .inflicted on him by the master during the voyage.
2.. The passenger is allowed to appear at the custom-house with his goods, consisting often of all his personal property, and there, if required, take the oath prescribed by the acts of Congress, and get his property relieved from taxation. The clothes on his person, and the money in his purse, from which the tax is sought, may freely land as protected imports; and yet the State laws under consideration' forbid the owner to land; they hold him out of the courts, and separate him from his property, until, by coercion, he pays to the master for the use of the State any amount of tax the State may at its discretion set upon- him and upon his family; and' this on the assumption that Congress has not. regulated in respect to his free admission.
*444 And how does the assumption stand, that a poll-tax. may be levied on all passengers, notwithstanding our commercial treaties ? By the fourteenth article of the treaty of 1794 (known as Jay’s treaty), and which article was renewed by. our treaty with Great Britain of 1815, it was stipulated that reciprocal: liberty of commerce should exist between the United States and all the British territories in Europe: — “ That the inhabitants of Great Britain shall have liberty freely and securely to come with their ships and cargoes to our ports, to- enter the same, and. to remain aftd reside in any part of our territories ; also, to hire and occupy houses and warehouses for the purposes of their commerce.” And that no higher or other duties should be imposed on British vessels than were by our laws imposed on American vessels coming into our ports from Great Britain, and that our people should have reciprocal rights in the British ports and.territories. ■
The taxes under consideration are imposed on all persons engaged in commerce who are aliens, no matter where they are from. We have commercial treaties of the same import with the one above recited with almost every nation whose inhabitants prosecute commerce to the United States; all these are free to come and enter our country, so far as a treaty can secure the right. Many thousands of men are annually engaged in this commerce. It is prosecuted, for a. great portion of the territory of the United States, at and through the two great ports where these taxes have been imposed-; and it is a matter of history, that the greater portion of our foreign- commerce enters these ports. There aliens must come as passengers to prosecute commerce and to trade, and the question is, Gan the' States tax them out, or tax them at all, in the face of our treaties expressly providing for their free and secure admission ?
It is thus seen to what dangerous extents these State laws have been pushed ; and that they may be exte> "’ed, if upheld by this court, to every ferry-boat that crosses a narrow water within the flow of tide which divides States, and to all boats crossing rivers that are State boundaries, is evident.
These laws now impose taxes on .vessels through their masters, in respect to the master's and crews, and all passengers on board, when the vessel commences and ends its voyage within sight and hearing of the port where the tax is demandable, making no distinction between citizens and aliens. ■ They tax, through the masters, all American vessels coming from other States (including steamboats) protected by coasting 'licenses,' under United States authority, and also exempt by the Constitution- from paying duties^ in another State. They tax, through the masters, foreign vessels protected by the Constitu *445 tion from tonnage duties, save by the authority, of Congress, and who are also protected by treaty stipulations. They tax passengers whtrare owners, and agents of the vessel, and accompany the ship. They tax owners, agents, and servants who accompany goods brought in for'sale, and who are by our treaties at full liberty freely tascóme-and reside in any part of our territories in pursuit of foreign commerce.
The tax is demandable from the master on entering the port, , and the law. provides that, when hé pays the. money to the State collector, the master may, by way of remedy over, recover by suit from each passenger the sum paid on his account. • And it is. insisted that the master had still a better remedy in the carrier’s lien- on goods of passengers, which he might detain, and by this means coerce payment at once before the vessel landec].
Plainly, this latter was the principal mode, of distress contemplated by the State- authorities, as wives and children could . not be sued, nor have they any property, and therefore proper- ■ ty of heads of families could only be reached on their account.
Now what do these laws require the master to do ? As- the-agent of New York, and as her tax-collector, he is required to levy the tax on goods of passengers, and make it out of. property which is beyond the.reach of the State laws; and yet the . thing is to be done by.force of thése same State laws. Sup-, pose it to be true, that this forcing the master, to levy a distress on protected goods is yet no tax on him or his vessel, and therefore, in that respect, the law laying the tax does not violate the Constitution ; all this would only throw the tax from one protected subject to another, — it would shift the burden from the master and vessel on to the goods of the passenger, which.are as much protected by the Constitution ■ and acts-of • Congress as the toaster and vessel.
And how would this assumption, that a State law may es- - cape constitutional invasion, by giving a remedy over, operate in practice ?
Béfore; the Constitution existed, the States taxed the commerce and intercourse of each other. This was the leading cause of abandoning" the Confederation and forming the Constitution, —more than all other causes it led to the result; and. the provision prohibiting the States from laying any.duty on imports or exports, and the one which declares that vessels bound to or from one' State shall not be obliged to enter, clear, or pay duties in another, were especially intended to prevent the evil. Around our extensive seaboard, on our gréat lakes, and through our great rivers, this protection is relied on against State assumption and State interference. Throughout' the' *446 Union, our vessels of every description go free and unrestrained, regardless of State authority. They enter at pleasure, depart at pleasure, and pay no duties. Steamboats pass for thousands of miles on rivers that are State boundaries, not knowing nor regarding in whose jurisdiction they are, claiming protection under these provisions of the Constitution. ' If they did not exist, such vessels might be harassed by insupportable exac-tions. If it be the true meaning of the Constitution, that' a State can evade them by declaring that the mastei may be taxed in regard to passengers, on the mere assertion that he Shall have a remedy over against the passengers, citizens and aliens, and that the State may assess the amount of tax at discretion, then the old evil will be revived, as the States may tax at every town and village where a vessel of any kind lands. They may tax on the assumption of self-defence, or on any other assumption, and raise a revenue from others, and thereby exempt their own inhabitants frpm taxation.
If the first part of the State law is void, because it lays a duty on the vessel, under the disguise of taxing its representative, the mastér, how can the after part, giving the master a remedy over against passengers, be more valid than its void antecedent ? All property on board belonging to passengers is absolutely protected from State, taxation. And how can a State be heard to say, that truly she cánnot make distress on property for want of power, but still that she can create the power in the master to do that which her own officers cannot do ?
In the next place, the Constitution, by article first, section eighth, provides, that “ the Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common' defence and general welfare of the United States.”
Such taxes, may be laid on foreign commerce-as regulations of revenue ; these regulations are the ordinary ones to which the Constitution refers. Congress has no power to lay any but uniform taxes when regulating foreign commerce to the end of revenue, — taxes equal and alike at all the ports of entry, giving no one a preference over another. Nor has Congress power to lay taxes to pay the debts of a State, nor to provide by taxation for its general welfare. Congress may tax for the treasury of the Union, and here its power ends.
The question, whether the power to regulate commerce and navigation is exclusive in the government of the United States, or whether a State may regulate within its own waters and ports in particular cases, does not arise in this cause. The question here is, whether a State can regulate foreign - com *447 merce by “ a revenue measure,” for the purposes of its own treasury. If the State taxes, with the consent of Congress,- the vessel directly, by a tonnage duty, or indirectly, by taxing the master and crew, or taxes the cargo by an impost, or assumes to tax passengers, or to regulate in any other mode, she assumes to exercise the jurisdiction of Congress, and to regulate navigation engaged in foreign commerce ; she does that which Congress has the power to do, and is restrained by the Consti-' tution within the same limits to which Congress is restricted. And as Congress cannot raise money for the benefit of a State treasury, so neither can a State exercise the same power for the same purpose.
. Again: give the argument all the benefit.that it claims; concede the full municipal power in the State to tax all persons wiithn her territory, as a general rule, whether they have been there a year or an hour; and still she could not impose a capitation tax on these passengers by the hand of her own-tax-collector. The tax was demanded whilst they were on board. All the property they brought with them, the clothes and moneys on their persons, were imports ; that is, “ property imported or brought into this country from another country.” No duty could be laid on it by the State; as, until it was separated from the ship, it belonged to foreign commerce, and was' an import. Had the tax been imposed directly on the passengers, as a poll-tax is on land, and had the heads of families been bound to pay for their wives, children, and servants, and had the collector, with-the tax-list in his hand (which was an execution in fact), gone on .board, he woúldhave found no property that was not protected, which he could touch by way of distress to make the money. The passengers could defy him, could turn about, go to another port in the next State, land, and go their way. Here, then, a demand was made for a most stringent tax, which could not- be enforced at the time and place of demand from anybody, without violating the Constitution, various acts of Congress, and a most important commercial treaty.
It has also been urged on the court, with great earnestness, that, as this tax is levied for the support of alien paupers and purposes of eity police, and as the police power has not been taken from the States, that the “ object ” for which it was imposed brings it within the State power. City police is part of the State police, and on this assumption a poll-tax on foreigners might be ■ imposed to maintain almost the entire municipal power throughout the State, embracing the administration of justice in criminal cases, as well as numerous city expenses, together with the support of the poor. The objects *448 arid assumptions might, indeed, be endless. Were this court once to hold that aliens belonging to foreign commerce, and passengers coming from other. States, could have a poll-tax levied on them on entering any port of a State, on the assumption that the tax should be applied to maintain State police powers, and by this means the State treasury could be filled, the time is. not distant when States holding the great inlets .of commerce might raise all necessary revenues from foreign intercourse, and from intercourse among the States, and thereby .exémpt their own inhabitants from taxation altogether. The money once being in the treasury, the State legislature might apply it to any and every purpose, at discretion, as New York has done ; and if more was needed, the capitation’ tax might be increased at discretion, the power to tax having no other limitation.
The passengers in this instance were not subjects of any police power, or sanatory regulation-, but healthy persons of good moral character, as we are bound to presume, nothing appearing to the contrary ; nor had the State of New York mani-tested by her legislation any objection to such persons entering the State.
Again: it was urged that the States had the absolute power to exclude all aliens before the Constitution was formed, and that this power remained unsurrendered and unimpaired; that "it might be exercised in any form that the States saw proper to adopt; and having’the power to admit or reject at pleasure, the States might, as a condition to admission, demand from all aliens a.-sum of money, and if they refused to pay, the States might keep them out, nor could.Congress or a treaty interfere. If such -power existed in the State of New York, it has not been exerted in this instance. That it was intended .to impose a condition hostile to the admission of the passengers, in respect to whom the master was sued, is without the slightest foundation^ They were.not hindered or interfered with in any degree by the State law. It is a general revenue measure, and declares that the health-commissioner shall demand, and be entitled to receive, and in case of neglect or refusal shall sue. for and recover, from the master of every vessel from a foreign port that shall arrive' in the port of New York, for himself and each cabin passenger, one dollar and fifty cents; and for each steerage passenger, ’ mate,., .sailor, or marine, one dollar; and from the master of each coasting-vessel, for each person on board, twenty-five cents. No restraint is imposed on passengers', either of foreign vessels or of coasting-vessels. In the one case, as. in the other, the merchants, traders, and visitors in the cabin, and the immigrants in the steerage, were equally free to *449 come, into the harbour, and equally welcome, to enter the State. She does not address herself to them at all, but demands a revenue duty from the master, making the presence of passengers the pretext. We have to deal with the law as we find it, and/ not with an imaginary case that it migh’t' involve,. but undoubtedly does not.
For the reason just stated, I had not intended to examine the question presenting the State right claimed, but it has become so involved in the discussions at the bar and among the judges, that silence cannot be consistently observed. The assumption is, that .a State may enforce a non-intercourse law excluding, all aliens, and having power to do this, she may do any act tending to that end, /but short of positive prohibition. If the premises be true, the conclusion cannot be questioned.
The Constitution was a compromise between all the States of conflicting rights among them. They conferred on one government all national power, which it would be impossible to make uniform' in a process of legislation by several distinct and independent State governments; and in order that the equality should be preserved as far as practicable and consistent with justice, two branches of the national legislature were created. In one, the States are represented* equally, and in the other, according to their respective populations. As part of the treaty-making power, the States are equal. The action of the general .government by legislation or by treaty is the action of the States and of their' inhabitants; these the Senate, the House of Representatives, and the President represent. This is the federal power. In the exercise of its authority over foreign commerce it is supreme. It may admit or it may refuse foreign intercourse, partially or entirely.
The Constitution is a practical instrument, made by practical men, and suited to the territory and circumstances on which it was intended to operate. To comprehend its whole scope, the mind must take in the entire country and its local governments. There were at the time of its adoption thirteen States. There existed a large territory beyond them already ceded by Virginia,-and other territory was soon expected' to be ceded, by North Carolina and Georgia. New States were in contemplation, far off from ports on the ocean, through which ports aliens must come to oür vacant territories and new State», and through these ports foreign commerce must of necessity be carried on by our inland population. We had several thousand miles of sea-coast; we adjoined the British possessions on the east and north for several thousand miles, and were divided from them by lines on land to' a great extent; and on the west and south we were bounded for three thousand miles and more *450 by the possessions of Spain. With neither of these governments was our intercourse by any means harmonious at that time.
Provision had to be made for foreign commerce coming from Europe and other quarters, by navigation in pursuit of profitable merchandise and trade, and also to regulate personal intercourse among aliens coming to our shores by navigation in pursuit of trade and merchandise, as well as for the comfort and protection of visitors and travellers coming in by the ocean.
Then, again, on our inland borders, along our extensive lines of separation from foreign nations, trade was to be regulated ; but more especially was personal intercourse to be governed by standing and general rules, binding the people of each nation' on either side of the line. This could only be done by treaty of nation with nation. If the individual States had retained national power,' and each might have treated for itself, any one might have broken its treaty and given cause of war, and involved other States in the war ; therefore all power to treat, or have foreign intercourse, was surrendered by the States; and so were the.powers to-make war and to naturalize aliens given up. These were vested in the general government for the benefit of the whole. This became “the nation.” known to foreign governments, and was solely responsible to them for the acts of all the States and their inhabitants.
The general government has the sole power by treaty to regulate that foreign commerce which consists in navigation, and in buying and selling. To carry on this commerce, men must enter the United States (whose territory is a unit to this end) by the authority of the nation-; and-what may be done in this respect Avill abundantly appear .by what has been done from our first administration under the Constitution to the present time, without opposition from State authority, and without being questioned, except by a barren and inconsistent. théory, that admits exclusive power in the general government to let in ships and goods, but denies its authority to let in the men who navigate the vessels, and those who come to sell the goods, and purchase our productions" in return.
Our first commercial treaty with Great Britain was that of 1794, made under the sanction of President Washington’s administration. By the fourteenth article, already referred to, the inhabitants of the king of Great Britain, coming from his Majesty’s territories in Europe, had granted to them liberty, freely and securely, and without hindrance or molestation, to come with their ships and cargoes to the lands, countries, cities, ports, places, and rivers within our territories, to enter the same, to resort there, to remain and reside there, Without limi *451 tation of time; and reciprocal liberty was granted .to the people and inhabitants of the United States in his Majesty’s European territories; but subject always, as to what respects this article, to the laws and statutes of the two countries respectively. This stipulation was substantially renewed by the treaty of 1815, article first. In the British dominions our inhabitants were to abide by the general laws of Great Britain, and in our territories the subjects and inhabitants of that country were to abide by the laws of the United States, and also by the laws of any State where they might be. But the treaty does not refer to laws of exclusion. The State laws could not drive out those admitted by treaty without violating it, and furnishing cause of war; nor could State laws interpose any hindrance or molestation to the free liberty of coming. We have similar, treaties with many cither nations of the earth, extending over much of its surface, and covering populations more than equal to one half of its inhabitants. Millions of people may thus freely come and reside in our territories without limitation of time, and after a residence of five' years, by taking the proper steps, may be admitted to citizenship under our naturalization laws. Thousands of such persons have been admitted, and we' are constantly admitting them now; and when they become citizens they may go into every State without restraint, being entitled “ to all the privileges and immunities of citizens of the several States.”
And as respects intercourse across our line of separation from the British possessions in America, it is agreed, by the third article of the treaty of 1794, “that it shall at all times be free to his Majesty’s subjects and to the citizens of the United States, and also to the Indians dwelling on either side of said boundary-line, freely to pass and repass, by land or inland navigation, into the respective territories and countries of the two parties on the continent of America, (the country within the limits of the Hudson’s Bay Company only excepted,) and to navigate all the lakes, rivers, and waters thereof; and freely to carry on trade and commerce with each other.” Tolls and rates of ferriage are to be the same, on either side of the line, that natives pay on that side.
Although this treaty was abrogated by the war of 1812, still I understand that it was intended to be renewed, so far as it regulated intercourse at our inland borders, by the second article of the treaty of 1815.
Thus have stood fact and practice for half a century, in the . face of the theory, that individual States have the discretionary power to exclude aliens, because the power was reserved to the States, is exclusively in them, and remains unimpaired by the Constitution.
*452 It is also insisted that the States may tax all persons and property within their respective jurisdictions, except in cases where they are affirmatively prohibited. This is a truism not open to denial. Certainly the States may tax their own inhabitants at discretion, unless they have surrendered the power. ■But constitutional exceptions to the State power are so broad as to render the claim valueless in the present instance. The. States cannot lay export' duties; nor duties on imports, nor tonnage duties on vessels. If they fax the master and crew, they indirectly lay a duty on the vessel. If the passengers' on board are taxed, the protected goods — the imports — are reached.
In short* when the tax- in question was demandable by the State law, and demanded, the ship rode in the harbour of New York; with all persons and property on board, as a unit, belonging to foreign commerce. She stood as single as when ■on the open ocean, and was as exempt from the State taxing power.
For the reasons here given, I think the judgment of the State court should be reversed because that part of the State law on which it is founded was void.