PEOPLE OF THE STATE OF NEW YORK *v.* COMPAGNIE GENERALE TRANS-
ATLANTIQUE.*

(*Circuit Court, S. D. New York.* February 9, 1882.)

1. CONSTITUTIONAL LAW—STATE TAX ON ALIEN PASSENGERS.

The act of the legislature of the state of New York, passed May 31, 1881, and known as chapter 432, Laws 1881, which provides that a tax of one dollar be levied upon every alien passenger who shall come by vessel from a foreign port to the port of New York, and that out of said tax the commissioners of emigration of New York shall expend all such sums as may be necessary to enable them to execute the inspection laws of the state of New York, with the execution of which they are or may be charged, which inspection laws have reference to the examination of said passengers, and that any balance of said tax shall be paid into the treasury of the United States, is a regulation of commerce with foreign nations, and as such is unconstitutional and void.

2. SAME—SAME—INSPECTION LAWS.

Such act cannot be maintained under article 1, § 10, of the constitution of the United States, as a law laying a duty on imports to execute an inspection law. "Imports" and "inspection laws," within the meaning of that section, have reference solely to merchandise, and do not include persons.

*Henderson* v. *The Mayor*, 92 U. S. 259, cited and applied.

On Demurrer to Complaint.

*Lewis Sanders* and *George N. Sanders*, for plaintiffs.

*Frederick J. Coudert*, for defendant.

BLATCHFORD, C. J. This suit was commenced in the court of common pleas for the city and county of New York, and was removed into this court. The complaint was put in in the state court. It alleges that the defendant is and was, at the times thereinafter mentioned, a corporation formed under the laws of France, and owner of the vessels thereinafter named; that the defendant, by vessels from a foreign port, brought to the port of New York alien passengers, for whom a tax has not heretofore been paid by the vessels, on the dates, from the ports, and to the number stated in the complaint, being in June, July, and August, 1881, by nine vessels on sixteen voyages, all from Havre or Marseilles, the number of alien passengers being, in all, 6,214; that the master, owner, agent, and consignees of such vessels, each and all, failed and neglected to pay, or cause to be paid, to the chamberlain of the city of New York, within 24 hours after the arrival of each of said vessels at the port of New York, or at any time, the sum of one dollar for each and every one of said passengers so brought, as aforesaid, nor has any part

*Reported by S. Nelson White, Esq., of the New York bar.

thereof been paid; and that there is du/ to the plaintiffs from the defendant, by reason of the premises, the sum of $7,767.50, debt and penalty, and interest thereon from the day after the entry of each vessel at the port of New York, for the tax and penalty imposed by law, respectively, for which sum, with interest, the plaintiffs demand judgment, with costs. The defendant has put in, in this court, a demurrer to the complaint, which states, as a ground of demurrer, that it does not state facts sufficient to constitute a cause of action. The parties, by their attorneys, have stipulated, in writing, that this action "is brought and prosecuted under and pursuant to an act of the legislature of the state of New York passed May 31, 1881, and known as chapter 432 of the Laws of 1881;" and that the demurrer is based upon the claim that the said act "is repugnant to various provisions of the constitution of the United States, (particularly article 1, § 8, and subdivision 2 of § 10,) and also, to the Revised Statutes of the United States, and also to the provisions of the treaties now existing between the United States and France, and other countries." The stipulation states that its intent is "to remove any question as to the right of the defendant to present and argue all such questions with the same force and effect as if the demurrer assigned various causes, separately setting up each and every objection that may be based upon the constitution of the United States or of the state of New York, or upon any existing treaties with foreign powers, or upon any alleged want of power on the part of the state to enact such a statute as that now sought to be enforced, or of the plaintiffs to bring and maintain this action."

The act of May 31, 1881, (Laws of New York, 1881, c. 432, p. 590,) is as follows:

"Section 1. There shall be levied and collected a duty of one dollar for each and every alien passenger who shall come by vessel from a foreign port to the port of New York for whom a tax has not heretofore been paid, the same to be paid to the chamberlain of the city of New York by the master, owner, agent, or consignee of every such vessel within 24 hours after the entry thereof into the port of New York.

"Sec. 2. It shall be the duty of the master or acting master of every such vessel, within 24 hours after its arrival at the port of New York, to report, under oath, to the mayor of the city of New York, the names, ages, sex, place of birth, and citizenship of each and every passenger on such vessel, and, in default of such report, every passenger shall be presumed to be an alien arriving at the port of New York for the first time. And in default of every such payment to the chamberlain of the city of New York there shall be levied and collected of the master, owner, agent, or consignee of every such vessel a penalty of 25 cents for each and every alien passenger.

" Sec. 3. It shall be the duty of the chamberlain of the city of New York to pay over, from time to time, to the commissioners of emigration all such sums of money as may be necessary for the execution of the inspection laws of the state of New York, with the execution of which the commissioners of emigration now are or may hereafter be charged by law, and to take the vouchers of the commissioners of emigration for all such payments. And it shall be the duty of the said chamberlain to pay over annually, on the first of January in each year, to the treasury of the United States, the net produce of all duties collected and received by him under this act, after the payments to the commissioners of emigration aforesaid, and take the receipt of the secretary of the treasury therefor.

"Sec. 4. The commissioners of emigration shall institute suits in the name of the people of the state of New York for the collection of all moneys due, or which may grow due, under this act; the same to be paid, when collected, to the chamberlain of the city of New York, to be applied by him pursuant to the terms of this act.

"Sec. 5. Section 1 shall not apply to any passenger whose passage ticket was actually issued and paid for prior to the time this act takes effect; but every ticket shall be presumed to have been issued after this act takes effect, in the absence of evidence showing the contrary.

"Sec. 6. This act shall take effect immediately."

Three days prior to the passage of the said act, and on the twenty-eighth of May, 1881, (Laws of New York, 1881, *c*. 427, p. 585,) an act was passed as follows :

" Section 1. The commissioners of emigration are hereby empowered and directed to inspect the persons and effects of all persons arriving by vessel at the port of New York from any foreign country, as far as may be necessary to ascertain who among them are habitual criminals or paupers, lunatics, idiots, or imbeciles, or deaf, dumb, blind, infirm, or orphan persons, without means or capacity to support themselves, and subject to become a public charge, and whether their persons or effects are infected with any infectious or contagious disease, and whether their effects contain any criminal implements or contrivances.

"Sec. 2. On discovering any such objectionable persons or effects, the said the commissioners of emigration and its inspectors are further empowered to take such persons into their care or custody, and to detain or destroy such effects, if necessary for the public welfare, and keep such persons under proper treatment, and provide for their transportation and support as long as they may be a necessary public charge. The commissioners of emigration shall, in case of habitual criminals, and may in other cases, where necessary to prevent such persons from continuing a public charge, retransport such person or persons to the foreign port from which they came."

"Sec. 3. The commissioners of emigration are further empowered to board any incoming vessel from foreign ports arriving at the port of New York, by its agents and inspectors, who shall have such powers as may be necessary to the effectual execution of this act, and any person who shall resist them in the execution of their lawful functions shall be guilty of a mis-

demeanor, and may be arrested by the officer resisted, and, upon conviction, may be sentenced to a term not exceeding six months in the penitentiary, or to pay a fine of $100, or both.

"Sec. 4. This act shall take effect immediately."

These provisions were enacted with an endeavor to avoid the grounds on which former legislation had been held void as repugnant to the constitution of the United States. The provisions of part 1, c. 4, tit. 4, of the Revised Statutes of New York, which authorized the recovery from the master of every vessel arriving in the port of New York from a foreign port of a sum of money for each passenger, and appropriated the money to the use of the marine hospital, were held void in the *Passenger Cases*, 7 How. 283, in January, 1849. After that various amendments of the law were made, which came before the supreme court in *Henderson* v. *The Mayor*, 92 U. S. 259, in 1875, and were held void. This legislation required a bond for each passenger landed by a vessel from a foreign port to indemify the commissioners of emigration and every municipality in the state against any expense for the relief or support of the passenger for four years, but the owner or consignee of the vessel could commute for the bond, and be released from giving it by paying $1.50 for each passenger within 24 hours after landing him. If the bond was not given, nor the sum paid within 24 hours, a penalty of $500 for each passenger was incurred, which was made a lien on the vessel, collectible by attachment at the suit of the commissioners of emigration. The statute applied to every passenger, and not merely to every alien passenger. It applied to every passenger by a vessel from a foreign port, landed at the port of New York. The court held that the statute amounted to a requirement of the payment of the $1.50; that it was, in its purpose and effect, a law imposing a tax on the owner of the vessel for the privilege of landing in New York passengers transported from foreign countries; that, in taxing every passenger, it taxed a citizen of France landing from an English vessel for the support of English paupers landing at the same time from the same vessel; that a law prescribing the terms on which vessels shall engage in transporting passengers from European ports to ports in the United States is a regulation of commerce with foreign nations; that congress alone could regulate such commerce; and that a state could not, under any power supposed to belong to it and called police power, enact such legislation as that under consideration. The court expressly reserved the question as to how far, in the absence of legislation by congress, a state could, by appropriate legislation, protect itself against *actual*

paupers, vagrants, criminals, and diseased persons arriving in its territory from foreign countries. A provision of the legislation of New York, then under consideration, concerned persons who should, on inspection, be found to belong to those classes, but the court acted on and held void that part of the statute which applied to all passengers alike, and that part alone.

The act of May 31, 1881, differs from the prior statute only in levying a duty of one dollar for each alien passenger, instead of $1.50 for each passenger; and it may, perhaps, be limited to an alien who arrives for the first time. But it applies to such aliens who come as travelers for pleasure, and have means, and intend to go back, and to such aliens who come intending to remain, and have means, as well as to such aliens who are of the classes mentioned in section 1 of the act of May 28, 1881. It compels the owner of the vessel to pay one dollar for each of the alien passengers embraced in it for the privilege of landing him. The tax is expressly imposed for having the passenger come by the vessel from a foreign port to the port of New York. The new statute is as liable to the objection stated by the court in the *Henderson Case* as was the statute in that case.

But it is contended that the provisions of section 3 of the act of May 31, 1881, make the statute valid, as one laying an impost, or a duty on imports, for executing its inspection laws, under this provision of article 1, § 10, of the constitution of the United States:

"No state shall, without the consent of congress, lay any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts laid by any state on imports or exports shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the congress."

The act of May 28, 1881, is the only so-called inspection law of the state of New York cited as one with the execution of which the commissioners of emigration are charged by law. The money received from the one-dollar tax for each alien passenger arriving for the first time is to be expended, as far as necessary, in executing the act of May 28th.

The question arises, therefore, whether the act of May 28th is an inspection law within the meaning of article 1, § 10. Inspection laws were known when the constitution was framed in 1787, and what were inspection laws was well understood. They had reference solely to merchandise. Their object was to improve the quality

of articles, and fit them for exportation or domestic use. *Gibbons* v. *Ogden,* 9 Wheat. 1, 203; 1 Kent, Comm. 439; Story, Const. § 1017.

In No. 44 of the *Federalist,* article 1, § 10 of the constitution is commented on, and it is said that the manner in which the restraint on the power of the states over imports and exports is there qualified—that is, in regard to inspection laws—"seems well calculated at once to secure to the states a reasonable discretion in providing for the conveniency of their imports and exports, and to the United States a reasonable check against the abuse of their discretion."

In Burrill's Law Dictionary "Inspection" is defined thus: "Official view or examination of commodities or manufactures, to ascertain their quality, under some statute requiring it."

In Bouvier's Law Dictionary this is the definition: "The examination of certain articles made by law subject to such examination, so that they may be declared fit for commerce."

In *Clintsman* v. *Northrop,* 8 Cow. 45, the inspection laws of New York are said to be laws "to protect the community, so far as they apply to domestic sales, from fraud and impositions, and, in relation to articles designed for exportation, to preserve the character and reputation of the state in foreign markets."

By the constitution of New York of 1846, art. 5, § 8, all offices for "inspecting any merchandise, produce, manufacture, or commodity whatever," were abolished.

As the term "inspection laws," in the section under consideration, refers only to laws for inspecting articles of merchandise, this shows that the terms "imports" and "exports," in the same section, refer only to articles of merchandise. Persons are not imports or exports, or articles to be inspected, under the section. To pass a statute directing persons to be inspected to ascertain their condition as to character or pecuniary means, or physical characteristics, and then another statute calling the first one an inspection law, does not make it an inspection law. It was not and is not and can never be an inspection law, in the sense of the constitution. Nor can passengers arriving in the United States be imports or exports, in the sense of the constitution.

In *Brown* v. *State,* 12 Wheat. 419, 437, the section referred to was under consideration, and it was said by the court:

"What, then, is the meaning of the words 'imposts, or duties on imports or exports?' An impost, or duty on imports, is a custom or a tax levied on articles brought into a country, and is most usually secured before the importer is allowed to exercise his rights of ownership over them, because evasions of

the law can be prevented more certainly by executing it while the articles are in its custody. It would not, however, be less an impost or duty on the articles if it were to be levied on them after they were landed. The policy and consequent practice of levying or securing the duty before or on entering the port does not limit the power to that state of things, nor, consequently, the prohibition, unless the true meaning of the clause so confines it. What, then, are 'imports?' The lexicons inform us they are 'things imported.' If we appeal to usage for the meaning of the word we shall receive the same answer. They are the articles themselves which are brought into the country. 'A duty on imports,' then, is not merely a duty on the act of importation, but is a duty on the thing imported. It is not, taken in its literal sense, confined to a duty levied while the article is entering the country, but extends to a duty levied after it has entered the country. The succeeding words of the sentence, which limit the prohibition, show the extent in which it was understood. The limitation is, 'except what may be absolutely necessary for executing its inspection laws.' Now, the inspection laws, so far as they act upon articles for exportation, are generally executed on land, before the article is put on board the vessel; so far as they act upon importations, they are generally executed upon articles which are landed. The tax or duty of inspection, then, is a tax which is frequently, if not always, paid for service performed on land, while the article is in the bosom of the country. Yet this tax is an exception to the prohibition on the states to lay duties on imports or exports. The exception was made because the tax would otherwise have been within the prohibition."

These observations are persuasive to show that persons are not imports or exports, or the subjects of inspection laws, within section 10 of article 1. The word "imports" and the word "exports" must have equal extent and scope. The former can have no greater than the latter. The suggestion that persons departing from the United States by vessel could properly be said to be exported, or to be exports, under any circumstances, even when retransported by public authority, is not one which commends itself to the general understanding. If not exports they cannot be imports. The fact that the importation of persons is referred to in section 9 of article 1 has no effect to include persons within the word "imports," where that word is used. The clause referred to prevents congress from prohibiting prior to 1808 "the migration or importation of such persons" as any of the states then existing should think proper to admit. So far as this section referred to the involuntary arrival of persons, it had reference to persons brought in to become slaves and articles of merchandise.

There is nothing authoritative in the *Passenger Cases*, 7 How. 283, or in any other decision of the supreme court, which conflicts

with the foregoing views. The new statute of New York being void under the decision in the *Henderson Case*, no authority upholding it as a law laying a duty on imports to execute an inspection law can be derived from section 10 of article 1.

In *Railroad Co.* v. *Husen*, 95 U. S. 465, 472, the principle of the *Henderson Case* was affirmed and applied as a principle which forbids a state from burdening foreign commerce under the cover of exercising its police powers. It is such a burden to tax *all* alien passengers arriving by vessel for the first time, and the fact of examining or inspecting the persons of such passengers to see if they are good or bad, poor or rich, sane or lunatic, diseased or well, does not make the tax a tax to execute an inspection law.

Under this guise any law which required examination of any person or thing, and which used the word "inspection," could thereby be made an inspection law, and the restraint of the constitution could be frittered away, so long as the duties laid did not exceed what was necessary to execute the particular law. But there is, moreover, on the face of the act of May 28th, sufficient evidence that it can not be regarded as an inspection law. The acts of May 28th and May 31st cannot either of them derive any greater force from the fact that they are two acts, than the enactments in the two would have if they were all in one and the same act. The act of May 28th goes beyond the inspection and the ascertainment of the facts prescribed, and authorizes the commissioners to take the objectionable persons into their care or custody, and provide for the transportation and support of such persons "so long as they may be a necessary public charge." Some of the objectionable persons are defined to be "infirm or orphan persons, without means or capacity to support themselves, and subject to become a public charge." This is an eleemosynary system for supporting paupers, it may be for their lives. Able-bodied aliens arriving here for the first time, with means, in health, not among the classes called "objectionable" in the act, are to have a tax of one dollar laid for each of them to support such system. This is not an inspection law. It is a direct interference with the exclusive power of congress to regulate commerce with foreign nations.

It is urged for the plaintiffs that, inasmuch as section 10 of article 1 declares that the state inspection law shall be subject to the revision and control of congress, this court has no jurisdiction to revise or control the action of the state in exacting or administering the law. If the law is an inspection law, it is as such subject to the

revision and control of congress. But this fact cannot deprive the court of its power of adjudging, in a proper suit, whether the law is an inspection law at all, or whether it is a law of another character.

It results from the foregoing considerations that the demurrer is sustained, and judgment is ordered for the defendant, with costs.